

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-28-2001

# Riley v. Taylor

Precedential or Non-Precedential:

Docket 98-9009

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Riley v. Taylor" (2001). *2001 Decisions.* Paper 304.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/304

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 1 of 2

Filed December 28, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-9009

JAMES WILLIAM RILEY,
        Appellant

v.

STANLEY W. TAYLOR;
*M. JANE BRADY

*(Pursuant to Rule 43(c), F.R.A.P.)

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 91-cv-00438)
District Judge: Hon. Joseph J. Farnan, Jr.

Argued November 29, 1999

Before: SLOVITER, ALITO and STAPLETON, Circuit  Judges

Argued En Banc May 23, 2001

Before: BECKER, Chief Judge, SLOVITER, MANSMANN,
SCIRICA, NYGAARD, ALITO, ROTH, McKEE, BARRY,
AMBRO, FUENTES, and STAPLETON, Circuit Judges

(Filed: December 28, 2001)

Thomas J. Allingham, II (Argued)
Stephen D. Dargitz
Skadden, Arps, Slate, Meagher &
 Flom
Wilmington, DE 19899

Mary M. MaloneyHuss
Wolf, Block, Schorr & Solis-Cohen
Wilmington, DE 19801

Lawrence J. Connell
Widener University School of Law
Wilmington, DE 19803

 Attorneys for Appellant
James W. Riley

Loren C. Meyers (Argued)
 Chief of Appeals Division
William E. Molchen, II
 Deputy Attorney General
Department of Justice
Wilmington, DE 19801

 Attorney for Appellees
Stanley Taylor and M. Jane Brady

OPINION OF THE COURT

SLOVITER, Circuit Judge, with whom Judges Mansmann, Nygaard, Roth, McKee and Ambro join, with whom Judges Scirica and Fuentes join as to Part II B, and with whom Chief Judge Becker joins in the judgment.

Appellant James W. Riley, a 22 year old black man, was sentenced to death on the vote of a Delaware state jury in December 1982. If the time intervening between that sentence and this court's en banc consideration of the matter has been lengthy, it is not because there has been undue delay at any stage but because the case raises legitimate questions that go to the constitutionality of the original trial and sentencing. It was necessary to complete a series of proceedings in both state and federal court, none of them duplicative, before the case reached this stage.

2

After all, there can be no reconsideration after the execution of a death sentence.

I.

INTRODUCTION

According to testimony at the trial, Riley and Tyrone Baxter stopped in a liquor store in Dover, Delaware, on February 8, 1982, to get some beer and rob the store. Michael Williams waited in the car. Baxter testified that Riley, armed with a gun, placed a bottle of beer on the counter and announced the store was being robbed. When the store owner, James Feeley, a 59 year old white man, backed away from the cash register, Baxter grabbed the money out of the cash drawer. Riley tried to take Feeley's wallet, but Feeley resisted. At Baxter's urging, Riley shot Feeley in the leg. Feeley, who was then hopping up and down, apparently from the gunshot, said "[Y]ou f 'ing niggers." App. at 327. As Riley and Baxter were proceeding to the door to leave, Feeley threw a wine bottle that struck Riley in the arm. Riley then shot Feeley in the chest, killing him.

In May 1982, Riley, Baxter, and Williams were indicted on charges of felony murder, intentional murder, first degree robbery, possession of a deadly weapon during a felony, and second degree conspiracy. Riley pled not guilty to all charges. Baxter pled guilty to first degree murder and was sentenced to life imprisonment in exchange for his testimony against Riley. The murder and weapon charges against Williams were also dropped in exchange for his testimony against Riley, and he was subsequently convicted of the robbery and conspiracy charges.

Riley was represented at trial by appointed counsel, a defense-side civil litigator who had never represented a criminal defendant in either a murder or a capital case. His pretrial motions for co-counsel and funds for a private investigator were denied. The prosecutors in Riley's case were James Liguori and Mark McNulty. Liguori, the lead prosecutor, was a friend and neighbor of Feeley's, and they belonged to the same church.

3

The State presented the testimony of Baxter, Williams, Baxter's mother (who testified that Riley spent the night before the robbery at her house), and a witness who reported that Riley's fingerprints were on a bottle of beer in the liquor store. In defense, Riley testified that he was in Philadelphia on the day of the murder celebrating his mother's birthday. However, Riley's mother did not testify in support of his alibi. The only witness Riley presented other than himself was an inmate at the prison in which Baxter was incarcerated, and he testified that Baxter had admitted to shooting Feeley.

Riley was tried before and convicted on all counts by an all white jury in Kent County Superior Court (the Delaware trial court) in December 1982. Four days after the verdict, the jury proceeded to consider the penalty. The State sought the death penalty, relying only on Riley's felony murder conviction and using the underlying robbery as the lone aggravating circumstance. Following a two-hour penalty hearing, the jury unanimously recommended a sentence of death which the court accepted. Riley was also sentenced to life imprisonment without parole for intentional murder, 20 years imprisonment for robbery, 5 years imprisonment for possession of a deadly weapon, and 3 years imprisonment for conspiracy. Riley's attorney explained to the trial court that he spent only 14 hours preparing for the penalty phase because he had been too busy "with the defense and the merits" to spend more time building a case in mitigation. App. at 443-444.

Riley appealed his conviction and sentence on numerous grounds. In July 1985, the Delaware Supreme Court affirmed, see Riley v. State, 496 A.2d 997 (Del. 1985) (hereafter "Riley I"), and the Supreme Court of the United States denied certiorari, see Riley v. Delaware , 478 U.S. 1022 (1986).

Represented by new counsel, Riley filed a motion for post-conviction relief in Kent County Superior Court in March 1987 before Judge Bush, the judge who had presided at the trial (the "trial judge"), alleging, inter alia, that his trial counsel had provided ineffective assistance of counsel and that the prosecution had exercised its peremptory challenges in a racially discriminatory manner

4

in violation of Batson v. Kentucky, 476 U.S. 79 (1986). After three days of evidentiary hearings limited to the ineffective assistance of counsel claim, the trial judge denied Riley's motion. See State v. Riley, 1988 WL 47076 (Del. Super. 1988) (hereafter "Riley II"). Riley then requested the Superior Court consider reargument on his Batson claim. The trial judge had passed away and Judge Steele of the Superior Court ("the hearing judge") granted Riley's request for reargument, finding that Riley had established a prima facie case of discrimination under Batson . See State v. Riley, 1988 WL 130430, at *3 (Del. Super. 1988) (hereafter "Riley III"). After holding an evidentiary hearing, the hearing judge rejected Riley's Batson claim and all his other claims as well. See Riley v. State, No. 200, 1988 (Del. Super. Ct. April 21, 1989), App. at 886 (hereafter "Riley IV"). On appeal, the Delaware Supreme Court again affirmed, see Riley v. State, 585 A.2d 719 (Del. 1990) (hereafter "Riley V"), and the Supreme Court of the United States again denied certiorari, see Riley v. Delaware, 501 U.S. 1223 (1991).

On August 12, 1991, Riley filed a petition for a writ of habeas corpus in the United States District Court for the District of Delaware pursuant to 28 U.S.C. S 2254. Again Riley obtained new lead counsel, although his post-conviction counsel remained as co-counsel. The District Court denied Riley's request to amend his petition to add two additional claims and then denied his petition without an evidentiary hearing. See Riley v. Snyder, 840 F. Supp. 1012 (D. Del. 1993) (hereafter "Riley VI"). Riley appealed, and this court held that the denial of his motion to amend was an abuse of discretion and remanded the case so that Riley could raise all the issues he sought to raise in an amended petition. See Riley v. Taylor, 62 F.3d 86 (3d Cir. 1995) (hereafter "Riley VII").

Riley filed his amended habeas petition on August 28, 1995, alleging 12 grounds for relief. The District Court denied Riley's petition without holding an evidentiary hearing. See Riley v. Taylor, 1998 WL 172856 (D. Del. Jan. 16, 1998) (hereafter "Riley VIII"). We then issued a certificate of probable cause and Riley appealed, raising 12 claims. He asserted that:

5

1.  The State's exercise of peremptory challeng es to strike all prospective black jurors violated the Equal Protection Clause under Batson v. Kentucky, 476 U.S. 79 (1986).

2.  The State's continuing conduct in withholdi ng wiretap tapes of a key witness from Riley violated Brady v. Maryland, 373 U.S. 83 (1963).

3.  Riley received ineffective assistance of co unsel because he was prejudiced by trial counsel's deficient performance at the penalty hearing.

4.  The trial court violated Riley's Sixth and Fourteenth Amendment rights by denying his motions to appoint co-counsel and a private investigator.

5.  The prosecution and the trial court made improper remarks at the penalty hearing violating the Eighth and Fourteenth Amendments under Caldwell v. Mississippi, 472 U.S. 320 (1985).

6.  The trial court failed to probe equivocal r esponses during the death penalty voir dire in violation of Witherspoon v. Illinois, 391 U.S. 510 (1968).

7.  Riley's jury was unconstitutionally biased in favor of returning the death penalty because the trial judge's voir dire failed to identify all prospective jurors who automatically would impose the death penalty.

8.  Riley was deprived of his constitutional ri ght to a fair and impartial jury because of pretrial publicity.

9.  The Delaware Supreme Court's proportionalit y review violated Riley's Eighth and Fourteenth Amendment rights.

10. The trial court's jury instructions failed adequately to guide Riley's jurors on the law, thereby creating a substantial risk that the jurors would impose the death penalty in an arbitrary and capricious manner in violation of both the Eighth and Fourteenth Amendments.

11. The use of felony murder to establish both Riley's eligibility for death and the aggravating circumstance warranting imposition of the death penalty is arbitrary and capricious in violation of the Eighth and Fourteenth Amendments.

12. The District Court abused its discretion in not holding an evidentiary hearing, in denying Riley's motions to conduct discovery and expand the record, and in denying Riley's applications for funds for medical and investigative experts.

A divided panel of this court affirmed. See Riley v. Taylor, 2001 WL 43597 (3d Cir. 2001) (hereafter "Riley IX"). The author of this opinion dissented on two claims, those raising Batson and Caldwell violations (claims numbered 1 and 5 above). On March 5, 2001, the full court granted Riley's petition for rehearing en banc, and vacated the panel's opinion and judgment. See Riley v. Taylor, 237 F.3d 348 (3d Cir. 2001). Our order limited the en banc proceedings to the District Court's denial of Riley's Batson and Caldwell claims. See id. We now reverse and direct the District Court to grant the writ of habeas corpus. 1

The District Court exercised subject matter jurisdiction pursuant to 28 U.S.C. S 2254. We possess appellate jurisdiction pursuant to 28 U.S.C. SS 1291 and 2253.

II.

DISCUSSION

Riley presents two arguments to the en banc court. He argues first, that the prosecution exercised its peremptory challenges to strike black jurors in violation of the Equal Protection Clause of the Fourteenth Amendment, and second, that the prosecutor's statements to the jury in his opening argument at sentencing misled the jury regarding

_____

1. Our en banc order vacated the panel opinion and judgment in full. We will reinstate the portion of the panel opinion authored by Judge Alito that disposed of Riley's ten other claims, and append it hereto as Appendix A.

7

its role in the sentencing process in violation of the Eighth and Fourteenth Amendments. We will address each of these arguments in turn.

A.

THE BATSON CLAIM

Riley's claim that the prosecution violated the Equal Protection Clause by using its peremptory challenges to strike all three prospective black jurors from the jury panel because of their race, thereby leaving no black juror sitting on the jury, stems from the Supreme Court decision in Batson v. Kentucky, 476 U.S. 79 (1986).2

1. Preservation of Claim

The District Court held that Riley was procedurally barred from raising his Batson claim in his habeas petition because he failed to present that claim to the trial court. See Riley VIII, 1998 WL 172856, at *15. We do not agree.3 The Delaware Supreme Court concluded on Riley's direct appeal "that no Sixth Amendment peremptory challenge claim was fairly presented to the Trial Court," and also held, in the alternate, that Riley's Batson claim failed on the merits. Riley I, 496 A.2d at 1010. However, the Supreme Court of the United States has since made clear that, "[i]f the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available." Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991).

In his memorandum opinion granting Riley's motion for a post-conviction evidentiary hearing, the Superior Court

_____

2. Although Riley's trial occurred several years before the Batson decision, the Supreme Court did not deny certiorari in Riley's direct appeal until shortly after Batson was decided, thus entitling Riley to the benefit of that decision. See Griffith v. Kentucky, 479 U.S. 314, 328 (1987); Deputy v. Taylor, 19 F.3d 1485, 1491 n.6 (3d Cir. 1994).

3. Much of the discussion of procedural bar is taken from the opinion of Judge Alito from the panel opinion that was vacated. See Riley IX, 2001 WL 43597, at *2-*6.

hearing judge stated that he did not think the State Supreme Court would maintain its position that Riley had failed to timely present a Batson claim. See Riley III, 1988 WL 130430, at *2 (citing Baynard v. State, 518 A.2d 682 (Del. 1986)).4 Thereafter, the hearing judge considered and rejected Riley's Batson claim on the merits. See Riley IV, App. at 887–891. On appeal, the Delaware Supreme Court affirmed the hearing judge's decision, using language that expressly refers to the Superior Court's rejection of Riley's Batson claim on the merits. See infra note 9. Moreover, in that passage, the Delaware Supreme Court expressly reaffirmed its holding on direct appeal that the prosecution's use of peremptory challenges in this case did not violate the state constitution. Not only is there no reaffirmation of its prior holding concerning procedural default, but there is no reference to that holding, leading us to conclude it no longer relied on a procedural bar. See Harris v. Reed, 489 U.S. 255, 266 (1989) (concluding that habeas claim was not procedurally barred where state court rejected the claim on the merits notwithstanding its observation that allegations "could have been raised [on] direct appeal").

If the Delaware Supreme Court had continued to believe at the time of its most recent decision that Riley's Batson claim was foreclosed for failure to make a proper objection at the time of trial, it seems likely that the Court would have made that point expressly, instead of affirming the hearing judge's findings on the merits. Indeed, it is unlikely that it would have made no comment on the hearing judge's failure to follow its earlier decision on foreclosure. Thus, we interpret the decision of the Delaware Supreme Court in Riley V (its most recent) to be a rejection of Riley's Batson claim on the merits. Accordingly, Riley's Batson claim is not procedurally barred and we proceed to examine its merits.

_____

4. In Baynard, the Court held that the defendant sufficiently raised an objection to the State's peremptory challenges which resulted in an all white jury being impaneled where defendant "noted the race of each black against whom the State exercised a peremptory challenge," "moved the Court to refuse the peremptory challenges against two of the drawn black jurors and moved to quash the entire panel at the end of the jury selection process." 518 A.2d at 687.

2. Batson v. Kentucky

In Batson, the Supreme Court reiterated the well-settled principle that the Equal Protection Clause prohibits discrimination on account of race in selection of both the venire and the petit jury. See 476 U.S. at 88. This principle, which dates back at least as far as Strauder v. West Virginia, 100 U.S. 303 (1880), recognizes that racial discrimination in the selection of jurors harms "not only the accused whose life or liberty they are summoned to try," but also harms the potential juror, whose race "is unrelated to his fitness as a juror." Batson, 476 U.S. at 87 (quotation omitted). As the Court noted in Batson, "[s]election procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." Id.

The Court granted certiorari in Batson so that it could reexamine the evidentiary burden its opinion in Swain v. Alabama, 380 U.S. 202 (1965), had placed on a criminal defendant who alleged that the State improperly used its peremptory challenges to exclude jurors based on race. In Swain, the Court had held that a defendant could satisfy a prima facie case of purposeful discrimination by showing that a prosecutor, "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries." Id. at 223. The Batson Court noted that many lower courts interpreted Swain to hold "that proof of repeated striking of blacks over a number of cases was necessary to establish a violation of the Equal Protection Clause." Batson, 476 U.S. at 92. The Court in Batson recognized that this standard had "placed on defendants a crippling burden of proof " that resulted in "prosecutors' peremptory challenges [becoming] largely immune from constitutional scrutiny." Id. at 92-93 (footnote omitted). Accordingly, it rejected the Swain evidentiary formulation.

In the jurisprudence that has evolved following Batson, the inquiry has been characterized as a three-step one.

10

Batson stated that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." Id. at 96. Once the defendant makes a prima facie showing of racial discrimination (step one), the prosecution must articulate a race-neutral explanation for its use of peremptory challenges (step two). If it does so, the trial court must determine whether the defendant has established purposeful discrimination (step three). See id. at 96-98; Simmons v. Beyer, 44 F.3d 1160, 1167 (3d Cir. 1995); Deputy v. Taylor, 19 F.3d 1485, 1492 (3d Cir. 1994). The ultimate burden of persuasion regarding racial motivation rests with, and does not shift from, the defendant. See Purkett v. Elem, 514 U.S. 765, 768 (1995).

3. Riley's Batson Challenge in State Court

In this case, the hearing judge determined, and the State does not contest, that Riley made out a prima facie case of discrimination in jury selection, as the State had used its peremptory challenges to strike all three prospective black jurors from the venire, "result[ing] in an all-white jury sitting on a first degree murder trial involving a black defendant and a white victim." Riley III, 1988 WL 130430, at *2. The hearing judge then conducted an evidentiary hearing. The State proceeded to step two of the Batson inquiry by offering race-neutral justifications for its use of the peremptory challenges to strike Ray Nichols, Lois Beecher, and Charles McGuire, each of whom was black.

Liguori, the lead prosecutor at trial and the State's principal witness at the post-conviction relief hearing, testified that the State "wanted to have minority representation on the jury panel." App. at 792-793. He stated that he wanted jurors who would be attentive and who would vote for a death sentence. He testified that he wanted "to make sure we were not only going to get a conviction of murder in the first degree, but also the death penalty." App. at 797.

With respect to Nichols, Liguori remembered clearly that "Mr. Nichols was an individual who, and unfortunately the record doesn't reflect this, who was not, in my particular

11

mind, not certain with regard to being able to return a verdict for death." App. at 797-798 (emphasis added). As Liguori explained, "there was a pause and a significant pause in [Nichols'] answering [the court's] inquiry [at voir dire] and that to me was enough to suggest that he might not be able to return a death penalty and I didn't want anyone that wasn't going to give me a death penalty." App. at 798-799.

With regard to Beecher, Liguori testified that he struck her because of her response to the court that she did not think she could impose the death penalty. App. at 804.

As for McGuire, Liguori explained that he used the peremptory challenge because he presumed McGuire would be unable to "give his full time and attention" to the trial. App. at 801. According to Liguori,

> Mr. McGuire was an individual who had requested-- remember, this was going to be around Christmas also.
>
> Mr. McGuire had previously requested to be excused from jury service. When Mr. McGuire came up, the first thing I wanted to make clear--as I said earlier, I wanted someone that was going to be attentive and you can read all the books you want with regard to selecting prospective jurors and it is always make sure you have attentive jurors, people not concerned about getting home early to take care of their kids, or vacation.
>
> Mr. McGuire himself had requested the Court to excuse him. The Court didn't. When he went through his inquiry, we asked the judge to excuse him for cause. The judge said no. It then left us with no alternative but to think he would not give his full time and attention and therefore we struck Mr. McGuire.

App. at 801.

On cross-examination of Liguori, Riley's attorney introduced Liguori's handwritten notes from voir dire. Written next to McGuire's name was the word "Out." App. at 832. Among the names on the same page was that of Charles Reed, a white man who actually served on Riley's jury. Next to Reed's name on the sheet was written,"works

12

Lowe's, wants off." App. at 823. Despite repeated efforts by Riley's counsel to refresh Liguori's recollection, Liguori testified that he had no recollection of Reed whatsoever. Liguori agreed, however, that the notation next to Reed's name indicated that Reed had requested to be excused from service on the jury. Liguori offered no explanation for his decision not to strike Reed.

Riley then presented McGuire as a witness at the state post-conviction hearing. McGuire testified that, in contrast to Liguori's testimony, he had never asked to be excused from the jury. McGuire specifically denied ever indicating to either the prosecutors or the court that he was unwilling to serve on the jury or that he wanted to be excused. Instead, he testified that his supervisor had told him that he was going to make a "formal request" that McGuire be excused and that his supervisor did send a letter to the trial judge requesting he be relieved from jury duty. App. at 860. According to McGuire, in response to his supervisor's letter, he was questioned by the trial judge whom he advised of his willingness to serve on the jury. App. at 849–850.

Riley also presented evidence that in addition to the prosecutor's striking of the three prospective black jurors in his trial, the Kent County Prosecutor's office used its peremptory challenges to remove every prospective black juror in the three other first degree murder trials that occurred within a year of his trial.[5] Counsel for the State objected to the admission of this evidence, arguing that

_____

5. The three other trials were:

   a. Andre Deputy––state struck the lone prospective black juror, a second juror designated as "Indian," and six prospective white jurors;

   b. Judith McBride––state struck all three prospective black jurors, five whites, plus two other jurors whose race has not been identified; and

   c. Daniel Pregent––state struck the lone prospective black juror and four whites.

Although the race of two of the jurors who were ultimately impaneled has not been identified, the State does not contest Riley's assertion that every impaneled juror was white.

13

evidence of general prosecutorial practices was relevant only to Riley's prima facie case. The hearing judge rejected this argument and admitted the evidence, explaining that it was being offered to show that "the exercise of the peremptory challenges in this particular case followed some kind of pattern that exists in the prosecutorial actions in first degree murder cases involving minority defendants and it is not segregable or severable from past history." App. at 872.

Counsel for the State then requested and received an additional four weeks in which to "attempt to prepare the same sort of information which . . . would be contrary to the representations made by [Riley's counsel's] information." App. at 874. He informed the court that he had not yet been able to obtain materials from other cases, but he assured the court that "they do exist." App. at 874. Yet approximately one month after the hearing, the State advised the hearing judge by a letter dated January 27, 1989 from Jeffrey M. Taschner, Deputy Attorney General, that stated in full: "Please be advised that the State will not supplement the record of the post conviction relief hearing held in the above-captioned matter on December 30, 1988." Letter to this Court from Thomas J. Allingham II (Dec. 16, 1999), Ex. B (on file in the Clerk's office).

The hearing judge ultimately accepted the State's race-neutral explanations and rejected Riley's Batson  claim, without mentioning any of the evidence introduced by Riley at the hearing. See Riley IV, App. at 887-891. The Delaware Supreme Court affirmed, likewise without discussion of Riley's evidence. See Riley V, 585 A.2d at 725.

4. Standard of Review

A Batson claim presents mixed questions of law and fact. See Jones v. Ryan, 987 F.2d 960, 965 (3d Cir. 1993). We exercise plenary review over questions of law and we look to 28 U.S.C. S 2254 for our standard of review of findings of fact. See id. Riley's federal habeas petition was filed before the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 110 Stat. 1214, and therefore AEDPA does not govern our standard of review. See Lindh v. Murphy, 521 U.S. 320 (1997). Instead, under

14

the federal habeas statute in effect at the time Riley filed his petition, we must presume correct the state court's findings of fact unless one of the statutory exceptions applies. See 28 U.S.C. S 2254(d) (1988).

The District Court rejected Riley's Batson claim on the merits by relying on this presumption of correctness. See Riley VIII, 1998 WL 172856, at *17. Riley contends that the presumption of correctness is not warranted because the hearing judge's factual findings are "not fairly supported by the record," 28 U.S.C. S 2254(d)(8) (1988), and because he "did not receive a full, fair, and adequate hearing in the State court proceeding," 28 U.S.C. S 2254(d)(6) (1988). Because we resolve Riley's appeal pursuant to S 2254(d)(8), we need not consider Riley's latter argument.

The limited nature of review underlying the requirement that a federal court must defer to the state court findings of fact if they are "fairly supported by the record" reflects important policy considerations. See, e.g., Miller v. Fenton, 474 U.S. 104, 114 (1985) (presumption of correctness recognizes that "as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue"). In Rushen v. Spain, 464 U.S. 114, 122 n.6 (1983), the Court stated that "28 U.S.C.S 2254(d) requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations." The Court further noted that the statutory test set forth in S 2254(d)(8) "is satisfied by the existence of probative evidence underlying the [state court's] conclusion." Id.

In the instant case, it appears that the hearing judge's factual findings were based primarily on determinations regarding the credibility of Liguori at the post-conviction hearing. Such findings are generally owed "even greater deference" because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson v. City of Bessemer City , 470 U.S. 564, 575 (1985); see also Batson, 476 U.S. at 98 n.21 ("Since the trial judge's findings in [this] context .. . largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.").

Still, this does not signify that "federal review. . . is a nullity." Caldwell v. Maloney, 159 F.3d 639, 651 (1st Cir. 1998) (hereafter "Maloney"). In Purkett, the Supreme Court stated that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." 514 U.S. at 768. In addition, the Supreme Court has suggested, albeit in a non-habeas context, that reviewing courts need not accept a trial judge's findings based on credibility determinations if the witness has not told a "coherent and facially plausible story" or if his story is "contradicted by extrinsic evidence." Anderson, 470 U.S. at 575. Thus, we must determine whether there is fair support to conclude that the State put forth "a coherent and facially plausible" explanation of its strikes of the prospective black jurors or whether the State's explanations are "implausible." Ultimately, when we review the record at step three of the Batson inquiry, we must decide whether the state courts' acceptance of the State's explanation has been made after consideration of all the evidence on the record.

5. State's Race-Neutral Explanations

At the post-conviction hearing, the State proceeded to step two of the Batson inquiry by offering race-neutral reasons for striking the black jurors. It did so primarily through Liguori's testimony. Riley does not argue that the State failed to meet its step two burden. His contention is that the state courts failed to engage in the step three inquiry, which requires evaluation of the proffered race-neutral reasons in light of all the other evidence in the record.

Liguori contended he struck Nichols because he doubted whether Nichols would be willing to return a death sentence. He based this doubt on his clear recollection of "a significant pause" by Nichols when asked about the death penalty. App. at 798. Yet, as Liguori himself admitted in his testimony, the record reflects no such pause and no such uncertainty on Nichols' part.

At voir dire, Nichols had answered the two questions posed by the court regarding the jurors' willingness to sentence a defendant to death in a manner seemingly favorable to the prosecution:

16

Q: Do you have any conscientious scruples against finding a verdict of guilty where the punishment might be death or against imposing the death penalty even if the evidence should so warrant?

A: No.

Q: Regardless of any personal beliefs or feelings that you may have, if the evidence justified it, would you be able to find a person guilty of murder in the first degree and would you be able to impose the death penalty.

A: I think so.

App. at 226-227. A prospective white juror, Angelo LePore, provided the exact same answers to the court's questions, yet he was not stricken and actually served on Riley's jury. App. at 231-232. The record provides no basis for distinguishing Nichols from LePore.

Moreover, despite Nichols' alleged pause, the prosecutors did not ask the trial court to remove Nichols for cause or to inquire further into his willingness to award the death penalty, even though the trial judge excused six venirepersons for cause because they said they couldn't, or believed they couldn't, impose the death penalty, App. at 234-237, 245-246, 265-271, and two more who responded equivocally, App. at 273-276, 282-286. This raises the question why, if Nichols actually did pause "a significant pause," the State did not seek to have him removed for cause like the others. The record does not show (and the State does not claim) that the prosecutors ever expressed to the trial court the concern that Nichols would be unwilling to impose the death penalty, that the court independently expressed concern, or that any of the contemporaneous notes kept by the prosecutors as to some of the jurors reflected either the existence of a pause or the concern about which Liguori testified six years later. Thus, Liguori's explanation is entirely unsupported by the record. See Johnson v. Vasquez, 3 F.3d 1327, 1331 (9th Cir. 1993) (stating that courts are not bound to accept race-neutral reasons that are either unsupported by the record or refuted by it).

17

Similarly, the record offers little basis for distinguishing McGuire, a prospective black juror who was struck, from Reed, a white juror who served without challenge by the State. Liguori testified that he struck McGuire because McGuire asked to be excused from jury service and he feared that McGuire would be an inattentive juror. 6 Liguori, who claimed to remember Nichols' pause six years later without benefit of any assistance, testified that he had no recollection at all regarding Reed. Liguori's notes from voir dire, however, state that Reed "works Lowe's, wants off," App. at 823, which strongly suggests that Reed too was likely to be an inattentive juror. Yet at no point during voir dire did the prosecution ever express any concern over Reed's place on the jury. Based on this record evidence, there is no basis for distinguishing between McGuire's desire to be excused and Reed's desire to be excused.

Although the State strains to distinguish the two jurors by arguing that McGuire's desire to be excused from jury service was stronger than Reed's desire because McGuire's employer had intervened to seek his release, its effort is not persuasive. First, Liguori did not testify before the hearing judge that this was the basis for the strike; in fact, Liguori testified to the opposite -- that McGuire himself had asked to be excused from jury service. Second, even if McGuire would have been inattentive for work-related reasons, the prosecution's notes from voir dire connecting Reed's employment to his "wants off " suggest that Reed's desire to be excused from jury service may have been work-related as well. Third, there is no evidence in the record to suggest that a juror will be more inattentive because s/he wants to be off the jury for work-related reasons rather than for other reasons, which is the basis for the State's position that McGuire's desire to be excused was stronger than Reed's desire to "want[ ] off," documented in Liguori's contemporaneous notes.

With regard to both Nichols and McGuire, the state courts failed to mention in their opinions the weaknesses in the State's explanations, and therefore failed to complete the required step three Batson inquiry.

_____

6. In fact, McGuire testified at the post-conviction hearing that he never asked to be excused from the jury.

18

6. Statistical Evidence

In addition to Riley's challenge to the State's explanations at the post-conviction hearing for striking Nichols and McGuire by pointing to inconsistencies in the record, Riley introduced evidence that the prosecution used its peremptory challenges to strike every prospective black juror in the three other first degree murder trials occurring in Kent County within one year of Riley's trial. It did so both for the other black murder defendant and the two white murder defendants.[7] In these four trials (including Riley's), the prosecution struck all 8 prospective black jurors who were called, i.e., 100%. By contrast, the prosecution used its peremptory challenges to strike only 23 of the 71 prospective white jurors, or 32%. After the prosecution used its peremptory challenges to strike 23 whites, 8 blacks, 1 Indian, and 2 jurors of unidentified race, the remaining racial makeup of the actual jurors in the four trials was 48 white jurors. See Letter to this Court from Thomas J. Allingham II (Dec. 16, 1999), Ex. A (on file in the Clerk's office).

An amateur with a pocket calculator can calculate the number of blacks that would have served had the State used its strikes in a racially proportionate manner. In the four capital cases there was a total of 82 potential jurors on the venires who were not removed for cause, of whom eight, or 9.76%, were black. If the prosecution had used its peremptory challenges in a manner proportional to the percentage of blacks in the overall venire, then only 3 of the 34 jurors peremptorily struck (8.82%) would have been black and 5 of the 48 actual jurors (10.42%) would have been black. Instead, none of the 48 jurors were black.

Admittedly, there was no statistical analysis of these figures presented by either side in the post-conviction proceeding. But is it really necessary to have a sophisticated analysis by a statistician to conclude that

_____

7. The exclusion by the Kent County prosecutor of all black jurors in the trials of the two white defendants is relevant to establishing a pattern of
race-based use of peremptories. See Powers v. Ohio, 499 U.S. 400 (1991) (excluding jurors on the basis of race is unconstitutional regardless of the race of the defendant).

19

there is little chance of randomly selecting four consecutive all white juries? The State never argued before the hearing judge and does not argue before this court that the selection of four consecutive all white juries could have been due to pure chance. Nor does it suggest that Riley's evidence does not accurately represent Kent County prosecutorial practices. Moreover, not once has the State offered an explanation for its use of peremptory challenges to strike all prospective black jurors in the four consecutive capital cases. The State has never sought to explain the data by variables other than race. Nor has it sought to rebut Riley's evidence.

The failure of the State to produce evidence from other trials is significant because it was the State, not Riley, that would have had access to such evidence, it was the State that asserted that such evidence was available and forthcoming, and it was the State, not Riley, that failed to provide it. Yet again, neither the hearing judge in his opinion nor the Delaware Supreme Court discussed Riley's evidence that showed the systematic exclusion of blacks from the petit juries in Delaware. In fact, having stated that this evidence was introduced to demonstrate that "the exercise of the peremptory challenges in this particular case followed some kind of pattern that exists in the prosecutorial actions in first degree murder cases involving minority defendants," App. at 872, the hearing judge discussed neither the statistics nor the State's failure to explain them. Thus, once again by overlooking and ignoring a significant segment of Riley's evidence, the hearing judge's opinion does not satisfy the crucial third step of the Batson analysis.

7. Analysis

At the conclusion of the evidentiary post-conviction hearing, the hearing judge issued a written opinion in which he addressed the prosecutors' reasons for striking the three black jurors, as required by step three of the Batson inquiry. He stated:

> The State in this case provided race-neutral
> explanations for the peremptory challenges on all three
> black jurors. After examining the demeanor and

20

> credibility of the witnesses and prosecutors at the
> evidentiary hearing, I believe the State exercised its
> peremptory challenges entirely within the strictures of
> the Fourteenth Amendment. No factual basis exists for
> a successful claim of an equal protection violation. The
> State successfully rebutted any prima facie showing of
> discrimination in jury selection based upon race.

Riley IV, App. at 890-891. This determination that the prosecutors did not intend to discriminate on the basis of race in exercising their peremptory strikes against the three challenged jurors is a factual finding entitled to a presumption of correctness unless one of the exceptions in S 2254(d) (1988) applies. See Hernandez v. New York, 500 U.S. 352, 365-66 (1991).

The inquiry required by Batson must be focused on the distinctions actually offered by the State in the state court, not on all possible distinctions we can hypothesize. See Mahaffey v. Page, 162 F.3d 481, 483 n.1 (7th Cir. 1998) (concerning itself with actual reasons, not apparent ones, for state's use of peremptory challenges); Turner v. Marshall, 121 F.3d 1248, 1253 (9th Cir. 1997) ("The arguments that the State has made since the evidentiary hearing do not form part of the prosecutor's explanation."). Apparent or potential reasons do not shed any light on the prosecutor's intent or state of mind when making the peremptory challenge. As to both Nichols and McGuire, the hearing judge merely repeated Liguori's articulated explanations without any reference to, or analysis of, Riley's evidence of pretext and seems to have accepted the State's justifications at face value.

Liguori simply testified that he struck McGuire because he would be inattentive at trial, and for no other reason, a justification that would apply equally to Reed. The State gave no explanation as to Reed other than Liguori's plain lack of memory. Cf. Harrison v. Ryan, 909 F.2d 84, 87 (3d Cir. 1990) (concluding that prosecutor's failure to recall his reason for striking prospective juror did not constitute a race-neutral explanation). And the credibility of Liguori's lack of memory is somewhat in doubt considering that he claimed to remember Nichols' "significant pause." The only distinction between the two jurors that is apparent from the

21

record is that McGuire, who was struck, is black; Reed, who was retained, is white.

A comparison between a stricken black juror and a sitting white juror is relevant to determining whether the prosecution's asserted justification for striking the black juror is pretextual. See McClain v. Prunty, 217 F.3d 1209, 1220 (9th Cir. 2000) ("A prosecutor's motives may be revealed as pretextual where a given explanation is equally applicable to a juror of a different race who was not stricken by the exercise of a peremptory challenge."); Jordan v. Lefevre, 206 F.3d 196, 201 (2d Cir. 2000) ("Support for the notion that there was purposeful discrimination in the peremptory challenge may lie in the similarity between the characteristics of jurors struck and jurors accepted. Where the principal difference between them is race, the credibility of the prosecutor's explanation is much weakened."); Maloney, 159 F.3d at 653 ("[A]s a general matter, comparisons between challenged jurors and similarly situated, unchallenged jurors of a different race or gender can be probative of whether a peremptory challenge is racially motivated."); Coulter v. Gilmore , 155 F.3d 912, 921 (7th Cir. 1998) ("A facially neutral reason for striking a juror may show discrimination if that reason is invoked only to eliminate African-American prospective jurors and not others who also have that characteristic."); Turner, 121 F.3d at 1251-52 ("A comparative analysis of jurors struck and those remaining is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination.").

The comparison between McGuire and Reed is strongly suggestive of the State's race-based use of its peremptory challenges. See, e.g., McClain, 217 F.3d at 1224 (concluding that Batson was violated where two of six proffered race-neutral explanations were "pretextual based upon comparisons of voir dire responses by non-black jurors who were seated without objection by the prosecutor," and other four were contrary to the facts); Turner, 121 F.3d at 1253-54 (holding that the district court clearly erred in finding that prosecutor did not discriminate in jury selection where sole justification offered for striking a black juror applied equally to non-stricken white juror); Devose v. Norris, 53

22

F.3d 201, 205 (8th Cir. 1995) (concluding that Batson was violated where the only justification prosecutor offered for striking three out of four prospective black jurors with prior jury experience was that they might be "burned out" by prior service and where at least five white jurors were not stricken although they had previously served on juries); Jones v. Ryan, 987 F.2d 960 (3d Cir. 1993) (rejecting the prosecutor's proffered race-neutral explanation for striking black jurors where the prosecutor did not apply the same rationale to similarly-situated white jurors); Garrett v. Morris, 815 F.2d 509, 514 (8th Cir. 1987) ("The prosecutor's rationale [for striking three black jurors]-- the blacks' purported lack of education, background, and knowledge -- seems clearly pretextual in light of his decision not to strike white jurors who differed in no significant way").

Nichols' answers as to his willingness to return a death sentence were the same as LePore's, and were it not for Liguori's testimony as to the suspect "significant pause," there would be no significant difference between them as well, except, of course, that Nichols, who was struck, is black and LePore, who was retained, is white.

Furthermore, each piece of evidence should not be reviewed in isolation. It is clear that "[a]n explanation for a particular challenge need not necessarily be pigeon-holed as wholly acceptable or wholly unacceptable. The relative plausibility or implausibility of each explanation for a particular challenge . . . may strengthen or weaken the assessment of the prosecution's explanation as to other challenges." United States v. Alvarado, 923 F.2d 253, 256 (2d Cir. 1991). In short, "[a] reviewing court's level of suspicion may . . . be raised by a series of very weak explanations for a prosecutor's peremptory challenges. The whole may be greater than the sum of its parts." Maloney, 159 F.3d at 651.

It is in this connection that we must turn to the statistical evidence presented by Riley of the pattern of the State's use of its peremptories. It may be that such evidence, standing alone, would not be sufficient to show intentional discrimination in selection of juries by the Kent County Prosecutor's office in the year in question. It is, however, particularly troublesome because the State failed

23

to provide the rebuttal data as to Riley's evidence when given the opportunity which it requested. In that circumstance, an inference adverse to the State may fairly be drawn. As has been recognized, "[w]here relevant information . . . is in the possession of one party and not provided, then an adverse inference may be drawn that such information would be harmful to the party who fails to provide it." McMahan & Co. v. Po Folks, Inc. , 206 F.3d 627, 632 (6th Cir. 2000) (quotation omitted). Indeed, the Supreme Court has stated, "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226 (1939). Accordingly, the State must accept the negative inference that flows from its failure to provide the rebuttal data, and that inescapable inference is that the Kent County Prosecutor's office did not want blacks on its juries in first degree murder cases.

The Supreme Court in Batson recognized the significance of evidence of systematic exclusion of blacks in jury selection. It stated, "Proof of systematic exclusion from the venire raises an inference of purposeful discrimination because the `result bespeaks discrimination.' " Batson, 476 U.S. at 94-95 (quoting Hernandez v. Texas, 347 U.S. 475, 482 (1954)). It likewise recognized the relevance of systematic exclusion of blacks from the petit jury. See id. at 96-97; see also McClain, 217 F.3d at 1224 (finding that "the fact that all blacks in the venire pool were struck raises an inference of discrimination" where 3 of 39 people in venire pool were black). On the record before us, it is difficult to avoid drawing the inference that the Kent County Prosecutor followed a pattern of using peremptory challenges in a racially discriminatory manner. 8

_____

8. The pattern is relevant even if Riley has not undertaken to prove a Batson violation in the other three trials. Defendants Daniel Pregent and Judith McBride were both tried before Batson was decided, and thus were not likely to have raised a Batson objection, particularly since neither was black and the Supreme Court did not extend the Batson holding to apply regardless of whether the defendant and excluded juror were of the same race until its opinion in Powers v. Ohio, 499 U.S. 400 (1991). The third capital defendant, Deputy, did not challenge the

24

Despite the State's efforts to explain away the various parts of the evidentiary picture Riley has presented, the record as a whole squarely contradicts its position. The questionable nature of Liguori's explanations for the strikes of McGuire and Nichols must be evaluated not only in light of the uncontested evidence of the use of peremptory strikes in Kent County but also in light of the nature of the State's pre-Batson defense on direct appeal.

When Riley's direct appeal came before the Delaware Supreme Court in 1984, the State justified the use of race in selecting jurors in criminal trials. On that occasion, which was the State's first opportunity to defend the use of its peremptory challenges in Riley's trial, the State did not offer a single race-neutral explanation, not even as an alternate argument; instead, it claimed that it was permissible -- even socially desirable -- to exclude jurors based on what it called "group association," App. at 896, which a Justice of the Delaware Supreme Court was reported to have recognized as a "euphemism for race," App. at 1321. In its brief to the Delaware Supreme Court, the State interpreted Swain v. Alabama, 380 U.S. 202 (1965), as "recogniz[ing] how peremptory challenges, even those exercised on the basis of group association, foster the constitutional goal of an impartial jury." App. at 896. The State added in a footnote that it "emphatically denies that the prosecutor [in Riley's case] exercised any of his challenges solely on the assumption that the juror's race, in the context of the facts of this case, indicated a verdict position adverse to the prosecution. Rather, the State will argue that even if such was the case, no constitutional command would have been contravened." App. at 896 (emphasis added).

_____

composition of the jury in the state courts and thus the racial makeup of the venire was not available when this court decided the appeal. See Deputy, 19 F.3d at 1491-93. Moreover, the Supreme Court in Batson made clear that "a defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection in his case." Batson, 486 U.S. at 95 (emphasis in original).

Before this court, the State contends that Swain was "good law" at the time, so reliance on that case cannot be viewed as a concession that some of its peremptory challenges may not have been race-neutral. Tr. of Oral Argument at 31. Yet, significant for purposes here is that in response to Riley's challenge to its use of peremptories, the State never denied on direct appeal that race played a role in its use of peremptory challenges; it only claimed that it did not exercise them solely based on race. Its justification for that practice certainly suggests that race was at least a partial basis for its use of peremptory challenges. And that suggestion further supports the conclusion we are led to by our earlier analysis of the record that the State's proffered race-neutral explanations are pretextual.

The requirement that we defer to the State's findings of fact does not apply when those findings are not supported by probative evidence. The State's position is that under S 2254(d) "all that is required" is that the state court make findings of fact, and flatly states that because the hearing judge did so, we must defer. Tr. of Oral Argument at 41. Although the State concedes that we must concern ourselves under Rushen, 464 U.S. at 121 n.6, with whether there is probative evidence in the record to support the state court's findings, it then seems to argue that since the findings are primarily based on credibility determinations, the mere fact that Liguori testified is sufficiently probative to support these determinations.

Certainly it is not required that a federal court should defer to a state court's findings of fact on habeas review as long as the state court accepted the prosecutor's race-neutral explanation, no matter how incredible, contradicted, and implausible it may be. On the contrary, several courts of appeals have acknowledged that the traditional level of deference should not govern appellate review when a prosecutor's explanations are obviously not credible. See McClain, 217 F.3d at 1221 (" `[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.' ") (quoting Purkett, 514 U.S. at 768); United States v. Griffin, 194 F.3d 808, 826 (7th Cir. 1999) (noting that a basis for reversal of state court exists where "the reason given [by the

26

prosecutor] is completely outlandish or there is other evidence which demonstrated its falsity"); Maloney, 159 F.3d at 651 (stating that serious questions of pretext arise when the facts in the record are "objectively contrary to" the prosecutor's explanations).

In light of the lack of probative evidence in the record to support the findings that the State exercised its peremptory challenges at Riley's trial in a race-neutral manner, we decline to give these findings deference. Such deference is ordinarily based, at least in part, on the original trial court's ability to make contemporaneous assessments. See Hernandez v. New York, 500 U.S. at 365. Recently, the Court of Appeals for the Fourth Circuit deferred to the state court's findings on a Batson claim precisely because the court had that opportunity. It explained,

> Indeed, it would be an impermissible exercise in hindsight for us now to upset the trial court's credibility determination in evaluating the prosecutor's explanation. And as the district court correctly observed, the `retrospective parsing of the `curricula vitae' of the jurors' is no substitute for the observations of the trial judge, who witnessed first-hand the process. We simply cannot overlook the fact that the trial court had conducted an extensive voir dire of the jury pool, which was documented in several hundred pages of trial transcripts, and was able to observe the demeanor and hear the responses of the prospective jurors in court. This insight enabled the trial court to compare the prosecutor's explanation with what occurred at the bench and in open court. Most significantly, the trial court was able to observe the prosecutor's demeanor and conduct and evaluate the credibility of his explanation.

Evans v. Smith, 220 F.3d 306, 316 (4th Cir. 2000) (emphases added).

It may be that because the findings at issue here were made by the hearing judge six years after the State had exercised its peremptory challenges before the trial judge and the hearing judge neither witnessed the challenges first-hand nor examined the witnesses at the time the

27

challenges were exercised, he did not note or comment on some of the troublesome inconsistencies in the State's race-neutral explanations.

Deference in a Batson case must be viewed in the context of the requirement that the state courts engage in the three-step Batson inquiry. As the Court of Appeals for the Fourth Circuit described step three: "If [the State's] burden [under step two] is met, the court then addresses and evaluates all evidence introduced by each side (including all evidence introduced in the first and second steps) that tends to show that race was or was not the real reason and determines whether the defendant has met his burden of persuasion." McMillon, 14 F.3d 948, 953 n.4 (4th Cir. 1994); see also Jordan, 206 F.3d at 200 (stating that step three of Batson inquiry requires examination of "all the facts and circumstances") (quotation omitted).

Here, the state courts failed to examine all of the evidence to determine whether the State's proffered race-neutral explanations were pretextual. Not only is there no indication on the record that the hearing judge engaged in the required analysis, but there is no indication that the Delaware Supreme Court did so, by making findings which also would have been entitled to deference. See Sumner v. Mata, 449 U.S. 539, 547 (1981). The omission of the crucial step of evaluating the State's proffered explanations in light of all the evidence can be gleaned by the absence of the word "pretext" in both the opinion of the hearing judge and in the opinion of the Delaware Supreme Court. Nor is there any language in either opinion that suggests, whatever the words used, that either court recognized the nature of the analysis it was required to undertake. In Jones v. Ryan, we noted that the state court decision rejecting a Batson claim contained no factual findings relating to the different prongs of the Batson analysis, to which we could accord a presumption of correctness. See 987 F.2d at 965-66. The situation before us is similar.

The State argues that our concern with the hearing judge's failure to discuss critical evidence in his decision is merely a complaint about the manner in which he wrote his opinion. It states in its supplemental brief that"[i]t may well have been better for the state judge to have further

28

explained his decision . . . . [b]ut the federal habeas statutes do not set standards for the writing of opinions by state judges." Supp. Memo. of Appellees at 7.

But the concern is not how the decision was written, a trifling matter. It is the failure of the state courts to complete the required Batson analysis by comparing the stricken black jurors with the sitting white jurors, acknowledging the statistical evidence of striking all black jurors in capital murder cases in Kent County within a year of Riley's trial, and recognizing the State's position in this very case that use of peremptories for racial reasons was both constitutional and socially beneficial.

Comparable to the case before us is the decision in Coulter v. Gilmore, 155 F.3d 912 (7th Cir. 1998). There the court acknowledged that deference is owed to the state court findings under S 2254(d), but rejected those findings and refused to apply the presumption of correctness because "the state judge made those findings without ever taking into account the totality of the circumstances on the record." Id. at 920. It noted that Batson requires "that, one way or another, a trial court . . . consider all relevant circumstances before it issues a final ruling on a defendant's motion." Id. at 921. In a compelling statement of the court's role under step three of the Batson inquiry, the court wrote:

> In light of the deferential standard of the post-AEDPA S 2254 and the perfunctory quality of the second step of a Batson inquiry after Purkett v. Elem, it is more important today than ever that the Batson inquiry not omit consideration of the totality of the circumstances, both for itself and as it relates to the evaluation of similarly situated potential jurors. . . . Under the pre-AEDPA standards that apply here, we agree with the district court that [defendant's] rights under Batson were denied.

Id. at 921-22.

The state courts in this case rejected Riley's Batson claim without discussing any of the ample evidence that throws into question the explanations offered by the prosecutor for striking two of the black jurors and there is nothing

29

relevant in the record that might otherwise support the state courts' decisions. Thus, we do not know why the state courts found the State's explanation was plausible and credible in light of the other evidence. It is because of the state courts' omission of a requirement under the third step of the Batson inquiry -- of an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances -- that the State's argument founders.

We cannot avoid noting that Batson was not a death penalty case. This is. If the State failed to accord Riley his constitutional right to a jury selected on a race-neutral basis, we must not shirk to so hold. As Riley's lawyer asked at oral argument, "If not this case, what case? If the evidence in this case is insufficient to show that the prosecutors' race-neutral rationales were pretextual, what case, short of a prosecutorial mea culpa would do the job?" Tr. of Oral Argument at 3.

After consideration of all the arguments and the record, we are compelled to conclude that the prosecution violated Riley's constitutional rights under Batson, and that Riley is entitled to relief.

8. The Dissenting Opinion -- The Batson Issue

It is fitting to discuss the Dissenting Opinion at this point because our difference with the Dissent is most acute in our respective views of the requirements of step three of the Batson inquiry. Although the Dissent takes issue with much of the majority opinion, its principal argument is that in a habeas case the federal court must defer to the state courts' findings, in this case the finding that the prosecutor did not use the State's peremptory challenges striking black jurors in a manner that violated the principles of Batson. We have already discussed in detail when a state court's findings are entitled to deference and when they are not, focusing on the exception in S 2254(d)(8) for the situation where the state court's findings are "not fairly supported by the record." See supra Part II.A.4 (Standard of Review). It is manifest that a finding that Batson has been satisfied must be made in accordance with the process enunciated in that case.

The Dissent agrees that under step three of the Batson inquiry a judge or court must consider "all of the relevant evidence that has been adduced." See Dis. Op. at 88. As we previously discussed, the courts after Batson have described step three as requiring the judge or court to examine the prosecutor's proffered reasons for striking the minority jurors against the evidence presented by the defendant and/or the weaknesses in the prosecutor's reasons. See, e.g., McMillon, 14 F.3d at 953 n.4; Jordan, 206 F.3d at 200. The Dissent sees no reason to believe that the Delaware courts did not do so in Riley's case, even though the opinions of the Delaware courts rejecting Riley's Batson challenges never commented on the weaknesses in the State's case or, even more important, never acknowledged that there was a step three to the Batson inquiry. We, therefore, proceed to try to ascertain whether the hearing judge and the Delaware Supreme Court made their findings that there was no purposeful discrimination in accordance with the process required by Batson. If not, then deference to those findings is not appropriate.

The extent of the Delaware courts' recognition of the need to engage in the step three inquiry is open to question on this record. Nothing in the discussion of the hearing judge suggests that the court performed the necessary evaluation. See Riley IV, App. at 887-91. The hearing judge, using language taken from Riley I rather than Batson, understood that his obligation was to consider the prosecutor's proffered explanation for striking the jurors and "then . . . be satisfied by that neutral explanation and make a ruling to that effect." App. at 888. Accordingly, following what he understood to be the applicable law, the hearing judge discussed the prosecutor's proffered reasons for the two strikes at issue here, and found that the prosecutor was credible. See App. at 889 ("the State provided a credible, race-neutral reason for exercising its peremptory challenge") (emphasis added); id. ("The State articulated a specific race-neutral ground for challenging juror McGuire. . . .") (emphasis added). Throughout, the hearing judge made clear that he understood that "[t]he test applied is the credibility of the explanation given . . . ." App. at 890. Nothing in the hearing judge's discussion suggests that he undertook an evaluation of the proffered reasons in light of

31

the evidence submitted by Riley, which is the essence of step three.

It is even more questionable whether on appeal from that decision the Delaware Supreme Court fully appreciated the requirement. Its entire discussion of this issue is fully set forth in the margin.9 In this one paragraph, the Court relied on its 1985 decision on Riley's direct appeal where it rejected Riley's challenge to the State's peremptory challenges. Riley I, 496 A.2d 997 (Del. 1985). The 1985 decision is noteworthy because on that occasion (a year before Batson), the Delaware Supreme Court concluded, for the first time, that "use of peremptory challenges to exclude prospective jurors solely upon the basis of race violates a criminal defendant's right under Del. Const., Art. I, S 7 to a trial by an impartial jury." Riley I, 496 A.2d at 1012.

In Riley I, the Court also set out the procedure to be followed10 but nothing in the Delaware Court's laudable

_____

9. The Court stated:

> Riley's next contention, that the State exercised its peremptory challenges for racial reasons, we find to be simply a renewed attempt to reopen previously settled issues. In Riley I, [496 A.2d 997 (Del. 1985)], we set forth a legal analysis functionally identical to the Supreme Court's analysis later articulated in Batson, 476 U.S. at 79. In Riley I, we found that Riley's constitutional right to an impartial jury had not been violated. 496 A.2d at 1009. The Superior Court, after an evidentiary hearing on Riley's motion for postconviction relief, held that Riley had not been denied equal protection as a result of the State's use of peremptory challenges. The court found that the State had provided race-neutral explanations for its peremptory challenges. We find no error in Superior Court's rejection of Riley's Batson claim. See Holland v. Illinois, 493 U.S. 474 (1990) (the Sixth Amendment fair cross-section requirement of an impartial jury does not deprive a party of the right to exercise peremptory challenges on racial or any other grounds from a venire that otherwise meets Sixth Amendment cross-sectional standards of representativeness). Moreover, we reaffirm our earlier decision sustaining the State's peremptory challenges on state constitutional grounds. Riley I, 496 A.2d at 1010-1013.

Riley V, 585 A.2d 719, 725 (Del. 1990).

10. That procedure required that the defendant make a prima facie showing after which the trial judge

decision requires an inquiry comparable to the Batson step three. The Delaware cases at that time appear to have required that the prosecutor provide, or articulate, a race-neutral reason for the peremptory challenges, and that the court find the prosecutor to be credible. They do not require an evaluation comparable to step three. Therefore, if, as it appears, the Delaware Supreme Court in Riley IV rejected Riley's Batson claim by relying on its earlier opinion in Riley I, and the Riley I opinion did not require a step three inquiry, any assumption that the Court engaged in such an inquiry would be unwarranted. Or, to phrase it somewhat differently, if the state courts' findings to which the Dissent would defer were not made in accordance with the process required by the United States Supreme Court, deference is not required.

This digression into Delaware law was undertaken to provide the context in which to view the Dissent's subsidiary argument, which is that we should assume that the Delaware courts performed the step three analysis and that it was not necessary for the Delaware courts to comment on that analysis. We do not suggest that every state court decision that is the subject of a habeas review be as explicit as a Social Security Administrative Law Judge's decision. See Dis. Op. at 89. But Batson is not a disability case. Although a judge considering a Batson challenge is not required to comment explicitly on every piece of evidence in the record, some engagement with the evidence considered is necessary as part of step three of the Batson inquiry.

_____

determine[s] whether there is a substantial likelihood that the prosecutor is exercising the State's peremptory challenges on the basis of race. A ruling in favor of the State will end any further inquiry. A ruling in favor of the defendant, however, will shift the burden to the State to prove that the exercised challenges were not racially motivated. To sustain this burden, the State . . . must satisfy the court that its peremptory challenges were made on grounds of specific, individual juror bias, or on grounds reasonably related to the particular case or trial . . . and not solely on the ground of the juror's race.

Riley I, 496 A.2d at 1013 (quotation and citation omitted).

In United States v. Harris, 192 F.3d 580, 588 (6th Cir. 1999), the Sixth Circuit reviewed the district court's rejection of a Batson challenge in a case where one African-American juror was seated but two were struck by the government's peremptory challenges. The Court of Appeals remanded because it found that the district court's"terse analysis" of step three of the Batson inquiry was insufficient as it appeared that the district court"made no effort to weigh the credibility of the prosecutor's asserted reasons for striking the panelists." Id. at 588. A year earlier, in United States v. Hill, 146 F.3d 337 (6th Cir. 1998), the same court remanded another case to the district court because its analysis of step three of the Batson inquiry was insufficient. The court stated, in language that could be equally applicable here, that "[t]he record before us indicates nothing about the district court's thought processes in its step three analysis apart from its abrupt conclusion indicating the apparent view that the prosecutor's asserted justification outweighed [the defendant's] showing under the totality of circumstances." Id. at 342. And in Hill, unlike here, the trial court ruling on the Batson claim at least stated that it performed some sort of weighing analysis.

Although both of these cases came to the Court of Appeals on direct appeal of a district court decision rather than on habeas review of a state decision, that does not detract from the force of the court's understanding of what is required in a Batson inquiry. The process required by Batson, including step three, does not differ if the prosecutor used the peremptories to strike jurors in a state trial or in a federal trial. After all, the same Constitution applies to both fora.

The Dissent relies almost exclusively on the statutory presumption of correctness owed to a state court's factual determination made after a hearing on the merits. This deference is indeed the fulcrum on which our federalism turns. Yet in case after case -- and most particularly in capital cases -- we have found that even applying the more stringent post-AEDPA standard of review (not applicable here), there are reasons not to accord the usual deference to the state courts' findings. See, e.g., Jermyn v. Horn, 266

34

F.3d 257, 305 (3d Cir. 2001) (post-AEDPA denial of deference to state court because it unreasonably applied the principles of Strickland v. Washington, 466 U.S. 668 (1984)); Moore v. Morton, 255 F.3d 95, 120 (3d Cir. 2001) (post-AEDPA denial of deference to state court because "[a] reasonable application of Supreme Court precedent . . . requires finding [defendant's] trial was so infected with unfairness that he was denied due process"); Appel v. Horn, 250 F.3d 203, 211 (3d Cir. 2001) (post-AEDPA denial of deference to state court because, among other things, the state court failed to apply the relevant Supreme Court precedent of United States v. Cronic, 466 U.S. 648 (1984)).

As we discuss in detail in the immediately preceding section of this opinion, see supra Part II.A.7 (Analysis), the requirement that the state courts faced with a Batson challenge engage in the critical step three analysis is not a product of our own creativity but an accepted element of a habeas court's obligation to examine whether a defendant's constitutional right to a race-neutral jury has been infringed. See, e.g., Jordan, 206 F.3d at 200; Coulter, 155 F.3d at 921; McMillon, 14 F.3d at 953 n.4; Jones, 987 F.2d at 967.

The Dissent accords little weight to these authorities. But our disinclination to include long string cites does not mean that there are not numerous cases in which the courts, both state11 and federal, have made clear that the Batson step three inquiry is not merely a formalistic one, but an integral element of the required analysis. In addition to Harris and Hill, the Sixth Circuit cases cited above, the Second Circuit has also made this point. In Barnes v. Anderson, 202 F.3d 150 (2d Cir. 1999), the court ordered a

_____

11. See, e.g., MacKintrush v. State , 978 S.W.2.d 293, 297 (Ark. 1998) (describing step three of Batson as requiring "that the trial court weigh and assess what has been presented to it to decide whether in light of all the circumstances, the proponent's explanation is or is not pretextual"); State v. Collier, 553 So.2d 815, 821 (La. 1989) (holding that
the trial judge cannot simply "[r]ubber stamp. . . [a prosecutor's] non-racial explanation, no matter how whimsical or fanciful, . . . [but] in order to permit a questioned [peremptory] challenge, . . . must conclude that the proffered reasons are, first, neutral and reasonable, and, second, not a pretext") (quotation omitted).

35

new trial because the trial court had denied a Batson motion "without explicit adjudication of the credibility of the non-movant's race-neutral explanations for the challenged strikes." Id. at 156 (emphasis added).

The Dissent suggests that we exceed our authority as a habeas court when we comment on the failure of the state courts reviewing Riley's Batson challenge to provide a reasoned statement for their rejection of Riley's challenge. Although the state court is not required to "comment on all of the evidence" before it, Dis. Op. at 89 (emphasis added), an adequate step three Batson analysis requires something more than a "terse," Harris, 192 F.3d at 588, "abrupt," Hill, 146 F.3d at 342, comment that the prosecutor has satisfied Batson.

Similarly, we do not think that a habeas court may reject a state court's ruling on a Batson claim simply because "it was not persuaded by a particular piece of proof," as the Dissent states. Dis. Op. at 87. However, as we have explained, without any such statement there is no basis on this record to determine if the state courts undertook, or even were aware of, the required Batson step three inquiry. The Fourth Circuit expressed the same thought in United States v. Joe, 928 F.2d 99, 103 (4th Cir. 1991), where it stated: "[T]he failure of the district court to rule at each step of the Batson analysis deprives . . .[a reviewing] court of the benefit of its factual determination and the reasons supporting its ultimate holding." And its cases make clear that such review requires that the trial court's rulings must be clearly articulated. See, e.g., Jones v. Plaster, 57 F.3d 417, 421 (4th Cir. 1995) ("The ruling of the district court is so unclear that we cannot determine on the present record whether the ultimate conclusion of the district court to overrule [the Batson] objection may be sustained."); United States v. Blotcher, No. 95-5590, 1996 U.S. App. Lexis 19835, *11-*12 (4th Cir. August 7, 1996) (unpublished) ("We find the record so unclear that we cannot determine whether the district court applied the proper legal analysis in sustaining the prosecution's Batson objection to [defendant's] peremptory strike against [a] juror.").

Most of the Dissent's other comments on the Batson issue in this case have been previously anticipated and

36

discussed. We take this opportunity, however, to remark upon the manner in which the Dissent comments upon the reference to the pattern of the State's use of its peremptories to exclude black jurors in all four first degree murder cases, including Riley's, tried in the county the same year. Because of the lack of information about some of those cases, we refrained from suggesting that such evidence, standing alone, would show intentional discrimination but pointed out that it was the State that sought an opportunity to produce supplementary evidence. The following correspondence, which was preceded by the oral dialogue quoted previously in its opinion, supra at typescript page 18, clarifies the situation.

On January 9, 1989, the hearing judge wrote to counsel:

> This will confirm the conclusion of the postconviction relief hearing in the above-captioned matter. It is the Court's understanding that the defendant's presentation and all rebuttal by the State available on the date of the hearing has been completed. However, at the State's request, the Court did hold the record open on the hearing to be supplemented by a rebuttal summary of jury composition in State peremptory challenges in first degree murder trials in Kent County over a determined period of time if the State wished to supplement the record.
>
> Further, the hearing record will close on January 30, 1989; the Court expects proposed findings of fact and conclusions of law from both parties no later than February 6, 1989.

See Letter to this Court from Thomas J. Allingham II (Dec. 16, 1999), Ex. B (on file in the Clerk's office) (emphasis added).

Some three weeks later, on January 27, 1989, and just before the hearing record was to close, the State advised the court as follows:

> Please be advised that the State will not supplement the record of the post conviction relief hearing held in the above-captioned matter on December 30, 1988.

Id.

37

Thus the State, which had assured the court that materials from other cases "do exist" that would be contrary to Riley's representation, App. at 874, and having been given the opportunity that it requested to supplement the record with evidence as to jury composition, surprisingly and without explanation, declined to produce evidence that blacks served on juries in first degree murder cases in the county in the same period that Riley was tried before an all-white jury. The presumption that could be drawn from these facts is one of the circumstances that should have been evaluated by the Delaware courts in the required step three inquiry.

The Dissent comments that Riley offered no expert analysis of the statistics. The procedural posture of the case at that time provided no such opportunity. Riley produced evidence of the statistics of the racial composition of the jurors in the four cases, the State requested the additional time to provide counter-evidence, and the hearing judge left the record open for that purpose. There would have been no basis for expert analysis until all the evidence as to jury composition was produced. The State's letter that it would produce no evidence was dated three days before the record closed.

Further, the Dissent's attempt to analogize the statistical evidence of the use of peremptory challenges to strike black jurors to the percent of left-handed presidents requires some comment. The dissent has overlooked the obvious fact that there is no provision in the Constitution that protects persons from discrimination based on whether they are right-handed or left handed. To suggest any comparability to the striking of jurors based on their race is to minimize the history of discrimination against prospective black jurors and black defendants, which was the raison d'etre of the Batson decision.

To reiterate, the factual findings of a state court are entitled to deference only when there is "probative evidence underlying [its] conclusion." See Rushen, 464 U.S. at 122 n.6. The Dissent points to no such probative evidence. It relies merely on the credibility finding of the hearing judge, a finding that we cannot be sure was made following consideration of all the evidence presented by Riley and the

38

weaknesses he pointed to in the prosecutor's proffered
reasons.

9. Appropriate Remedy

When counsel for the State was asked at the en banc
argument whether, if this court were to find a Batson
violation, the State would rather the relief be the grant of a
new trial or the remand for a federal evidentiary hearing,
counsel candidly responded:

> MR. MEYERS: If we -- the answer is yes. If, and if we
> -- I mean, if the court imagines, has all these problems
> with the hearing that was done six years after the trial,
> those problems are simply going to be magnified,
> amplified by exponential order of magnitude 20 years
> after the trial. I mean if you think that people have
> memory problems six years, how much worse are you
> going to be 20 years later?

Tr. of Oral Argument at 46. Riley's counsel concurred,
stating that a federal habeas judge would be no better off
than the hearing judge was in 1988.

We agree. Much of the Dissent's opposition is directed to
the majority's failure to remand to the District Court for a
hearing but the Dissent may have overlooked that both
parties preferred a new trial to a remand should this court
find that the state proceedings were not shown to be
consistent with the requirement of Batson. It is highly
unlikely that the witnesses can provide more illuminating
testimony thirteen years later. Moreover, there are no
factual issues that can be solved by a federal evidentiary
hearing.[12] Although the Dissent chooses to characterize the
result in this case as a federal court's substitution of its
own findings for those of the state court, in fact we are
merely fulfilling the traditional role of a federal habeas
court, which is, in part, to determine whether the state
court's decision is "fairly supported by the record." The one

_____

12. This is unlike the situation in Hakeem v. Beyer, 990 F.2d 750 (3d
Cir. 1993), where we held that the state court's finding regarding the
delay in the proceedings was not entitled to the presumption of
correctness but directed the district court to determine in a federal
habeas evidentiary hearing the reason for the delay.

39

possible factual issue cannot be resolved by a hearing,[13] and the statistical evidence, which might be the subject of some analysis at such a hearing, is relevant but not dispositive to our decision.

The question of the remedy a habeas court should order following a finding that the state process did not comply with constitutional requirements is not a new one. In Brown v. Kelly, 973 F.2d 116 (2d Cir. 1992), the federal court of appeals was faced with a comparable situation as that before us. Defendant was convicted in state court of murder and first degree robbery. He eventually came to the federal court with a petition for a writ of habeas corpus, claiming, inter alia, a violation of Batson. The federal courts did not find that Batson had been violated but the Second Circuit took the opportunity to consider the appropriate remedy when a constitutional violation is found by the federal courts sitting in habeas. The court stated,"[T]here are cases where the passage of time may impair a trial court's ability to make a reasoned determination of the prosecutor's state of mind when the jury was selected. Where such demonstrably exists, there must be a new trial." Id. at 121.

The Brown court cited United States v. Alcantar, 897 F.2d 436, 438-39 (9th Cir. 1990) (ordering a new trial because there was inadequate evidence to determine, as part of Batson analysis, why the jurors were struck). And in Barnes, 202 F.3d at 157, the Court of Appeals ordered a new trial rather than a remand for a hearing on the Batson issues because the trial judge had died and the court was "not confident . . . that further proceedings would . . . shed reliable light upon the voir dire.") (quotation omitted).

The circumstances of this case are closely analogous to those in Hardcastle v. Horn, ___ F. Supp. 2d ___, 2001 WL

_____

13. Although neither party has focused on it, there is an apparent factual discrepancy between McGuire's testimony that he did not request to be excused, App. at 850, and the trial judge's statement that McGuire came to see him and requested to be excused, App. at 250. It is agreed that McGuire saw the trial judge, but McGuire testified it was at the judge's direction. As the trial judge is deceased, a federal evidentiary hearing would not resolve this issue, even if it were important to do so.

722781 (E.D. Pa., June 27, 2001), where the district court found a Batson violation but dismissed the notion of ordering a federal evidentiary hearing instead of a new trial in state court, commenting that "[n]early twenty years have passed since Petitioner's trial, such a length of time that even Respondents admit that an evidentiary hearing on Petitioner's Batson claim is unlikely to be helpful." Id. at *19. The Hardcastle court stated that "[a] new trial is especially appropriate where as here, the passage of time makes a new evidentiary hearing on the petition impossible." Id.14 Likewise, we see no reason to order the District Court to provide Riley with an evidentiary hearing that it declined to provide on two prior occasions. Instead, we will reverse the District Court's order denying Riley's petition for a writ of habeas corpus, and remand for the District Court to grant the writ without prejudice to the State retrying the case pursuant to the guidelines to be set by the District Court.

B.

THE CALDWELL CLAIM

In addition to Riley's Batson claim presented to the en banc court, Riley argues that the prosecutor and the trial judge made remarks to the jury during the penalty hearing that misled the jury as to its sense of responsibility in the sentencing process, in violation of the principles set forth in Caldwell v. Mississippi, 472 U.S. 320 (1985). In Caldwell, the Supreme Court held that prosecutorial comments at sentencing violated the Eighth Amendment by leading the jury to believe that ultimate responsibility for determining the appropriateness of the death sentence rested with the state supreme court. See 472 U.S. at 333.

The Delaware Supreme Court, on direct appeal, rejected Riley's Caldwell claim, commenting that"[i]n no sense may

_____

14. The Hardcastle case is on appeal to this court, and our reference to this limited aspect of the decision, which is applicable here, is not intended to reflect an opinion as to the merits of the District Court's decision on the Batson issue.

41

it reasonably be said that the prosecutor was either misstating the law, misleading the jury as to its role, or minimizing its sentencing responsibility." Riley I, 496 A.2d at 1025. The District Court agreed, thus denying Riley habeas relief. See Riley VIII, 1998 WL 172856, at *31. A Caldwell claim presents mixed questions of law and fact subject to plenary review in the habeas context. See Miller v. Fenton, 474 U.S. 104, 112-14 (1985); see also Moore v. Gibson, 195 F.3d 1152, 1171 (10th Cir. 1999).

In Caldwell, the defense attorney in a capital murder case pleaded with the jury in closing arguments at the sentencing phase to spare the defendant's life. In reply, the prosecutor stated:

> Ladies and gentlemen, I intend to be brief. I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think it's unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know--they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it.

472 U.S. at 325 (emphases added).

Caldwell's defense counsel objected to this statement but the trial court overruled the objection, stating that it was "proper that the jury realizes it is reviewable automatically as the death penalty commands." Id. The prosecutor continued:

> Throughout their remarks, they attempted to give you the opposite, sparing the truth. They said `Thou shall not kill.' If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.

Id. at 325-26 (emphasis added).

42

Although the jury's sentence in Caldwell was indeed subject to automatic review by the state supreme court, the United States Supreme Court's plurality opinion stated that the prosecutor's statement was "inaccurate, both because it was misleading as to the nature of the appellate court's review and because it depicted the jury's role in a way fundamentally at odds with the role that a capital sentencer must perform." Id. at 336. Justice O'Connor, who cast the fifth and deciding vote, emphasized that "[j]urors may harbor misconceptions about the power of state appellate courts or, for that matter, [the United States Supreme Court] to override a jury's sentence of death." Id. at 342 (O'Connor, J., concurring). According to Justice O'Connor, the prosecutor's statements were impermissible because they "creat[ed] the mistaken impression that automatic appellate review of the jury's sentence would provide the authoritative determination of whether death was appropriate" whereas under state law the relevant scope of review was limited to whether the verdict was "so arbitrary that it was against the overwhelming weight of the evidence." Id. at 343 (O'Connor, J., concurring) (quotation omitted).

In Romano v. Oklahoma, 512 U.S. 1 (1994), the Supreme Court clarified the Caldwell holding. Accepting Justice O'Connor's concurrence as controlling, the Romano Court explained that Caldwell prohibits prosecutorial comments that "mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." Id. at 9 (quotation omitted). Accordingly, "[t]o establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." Id. (quotation omitted). The Court subsequently rejected Romano's Caldwell claim because "the jury was not affirmatively misled regarding its role in the sentencing process." Id.

In Riley's case, Liguori began his opening comments in the penalty phase by stating:

> As the Judge has explained to you we have a specific statute with regard to what occurred in a penalty hearing in a capital case.

43

Let me say at the outset that what you do today is automatically reviewed by our Supreme Court and that is why there is an automatic review on the death penalty. That is why, if you return a decision of death, that is why you will receive and have to fill out a two-page interrogatory that the Court will give you. This is an interrogatory that specifically sets out the questions that the State request and whether or not you believe it beyond a reasonable doubt and if you want in your determination, if you believe the sentence should be death than each and every one of you has to sign this. This goes to the Supreme Court. That is why it is concise and we believe clear and it should be looked carefully on and answered appropriately.

App. at 393 (emphases added).

At oral argument before the en banc court, the State conceded that Liguori's statement, at least "on its face," is no different from that of the prosecutor in Caldwell. Tr. of Oral Argument at 49. Counsel for the State told us that when "[y]ou compare the two, they are pretty much alike." Tr. of Oral Argument at 49. Like the statement in Caldwell, Liguori's statement regarding automatic appellate review was technically accurate since Delaware law provided for automatic review by the Delaware Supreme Court of a jury's sentence of death. However, that automatic review was extremely limited, as was that of the Mississippi Supreme Court in Caldwell.

At the time of Riley's sentencing hearing, the relevant portion of the capital sentencing statute provided:

The Supreme Court shall limit its review under this section to the recommendation on and imposition of the penalty of death and shall determine:

a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended . . . .

Del. Code Ann. tit. 11, S 4209(g)(2) (1982) (emphasis

44

added). Indeed, in Delaware the jury's weighing of aggravating and mitigating circumstances was, for all practical purposes, final. We have found no published opinion during the relevant time period in which the Delaware Supreme Court reversed a jury's sentence of death as arbitrarily or capriciously imposed.[15]

It is apparent, then, that, like the prosecutor's statement in Caldwell, Liguori's reference to automatic appellate review was misleading as to the scope of appellate review. As was explained in Caldwell, jurors may not understand the limited nature of appellate review, which affords substantial deference to a jury's determination that death is the appropriate sentence. See 472 U.S. at 332–33. Furthermore, jurors who are unconvinced that death is the appropriate punishment but who are eager to send a message of disapproval for the defendant's acts might be "very receptive to the prosecutor's assurance that [they] can more freely err because the error may be corrected on appeal." Id. at 331 (quotation omitted). As one of our sister circuits has explained, "[f]or the jury to see itself as advisory when it is not, or to be comforted by a belief that its decision will not have effect unless others make the same decision, is a frustration of the essence of the jury function." Sawyer v. Butler, 881 F.2d 1273, 1282 (5th Cir. 1989).

It is therefore not enough to argue, as the State does, that Liguori's comments at sentencing were a correct and accurate statement of Delaware law. The statute at the time contained more than 40 different provisions detailing procedures and requirements applicable to a death sentence, but the only one the prosecutor chose to emphasize was that providing for automatic review of the jury's sentence.

_____

15. The Delaware capital sentencing scheme was substantially amended in 1991. Under the amended statute, "the jury now functions only in an advisory capacity. The judge, after taking the jury's recommendation into consideration, has the ultimate responsibility for determining whether the defendant will be sentenced to life imprisonment or death." State v. Cohen, 604 A.2d 846, 849 (Del. 1992). In contrast, when Riley was sentenced, the jury's death sentence was binding on the judge.

Nor does the State satisfactorily explain why Liguori referred to "automatic review on the death penalty" in connection with his explanation of the interrogatory form. App. at 393. The interrogatory form contained only two questions: whether the jury unanimously found beyond a reasonable doubt that an aggravating circumstance existed[16] and, if the jury answered "yes," whether it unanimously recommended a sentence of death. Such a simple and straightforward form hardly needed an explanation. Instead, that "explanation" appears to have been used as a segue to alert the jury to the fact that the Delaware Supreme Court would automatically review its decision to impose a death sentence.

"The sentencing decision in capital cases is born out of an inherent and unique mixture of anger, judgment and retribution, and requires a determination whether certain acts are so beyond the pale of community standards as to warrant the execution of their author." Sawyer, 881 F.2d at 1278. Perhaps more than any other decision rendered by a jury, a sentence of death is "irreducibl[y] discretionary." Id. Yet in Caldwell, the Supreme Court noted that "[b]elief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an awesome responsibility has allowed this Court to view sentencer discretion as consistent with--and indeed as indispensable to--the Eighth Amendment's need for reliability in the determination that death is the appropriate punishment in a specific case." 472 U.S. at 330 (quotations omitted). It follows that there is particular concern "when there are state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court." Id. Unlike our decision in Zettlemoyer v. Fulcomer, 923 F.2d 284, 306 (3d Cir. 1991), where we rejected a Caldwell claim, in part because "[t]here was no suggestion to the jury that the [state] Supreme Court . .. or anyone else would have the last word in the case," here the prosecutor expressly stated both "there is an automatic

_____

16. The jury had previously been instructed that, by convicting Riley of felony murder, it already had found that an aggravating circumstance existed.

46

review" and "[t]his goes to the [state] Supreme Court." App. at 393.

The Dissent suggests that there was no Caldwell violation here because the prosecutor's statement was made "near the very beginning of his summation," and consisted of "accurate, unemotional, passing remarks." The Dissent also characterizes the prosecutor's remarks as "the mere mention of the fact that there would be an automatic appeal to the state supreme court."

It is true that the prosecutor's statement was made near the beginning of his summation, but his summation was not a lengthy speech, occupying a mere four pages of the transcript, App. at 393-97, of which the remarks in question take almost a full page. We cannot tell whether they were "emotional" or not, but they can hardly be characterized as "passing," as the prosecutor began by saying, "Let me say at the outset that what you do today is automatically reviewed by our Supreme Court." And, as we noted above, in that one paragraph, the prosecutor referred not once but twice to the Supreme Court –– both mentioning "automatic review" and that the interrogatory to be completed by the jurors also "goes to the Supreme Court."

We are unwilling to treat lightly the prosecutor's pointed references to appellate review of this crucial decision. Statements, like those made by the prosecutor here, "can be literally true but quite misleading by failing, for example, to disclose information essential to make what was said not misleading." Sawyer, 881 F.2d at 1285. As a result, a Caldwell violation may be established where a technically accurate statement describing the state appellate review process nonetheless "misled the jury to minimize its role in the sentencing process." Driscoll v. Delo, 71 F.3d 701, 713 (8th Cir. 1995) (holding that prosecutor had violated Caldwell by emphasizing that the trial judge could disregard the jury's recommendation of death even though no state judge had in fact ever done so).

Given the limited nature of the Delaware Supreme Court's review of a jury's sentence of death at the time of Riley's sentencing, a fact Liguori did not explain to the jury,

47

we conclude that there was a Caldwell violation in this case.17 As suggested in Caldwell, jurors are unlikely to understand the exceptionally narrow scope of appellate review given to jury determinations on death. See 472 U.S. at 330-31; see also id. at 342 (O'Connor, J., concurring). Although Liguori's remarks were brief, they were the first comments that the jury heard at sentencing, making them more likely to have made an impression. A statement does not have to be lengthy to be effective in suggesting to the jury that ultimate responsibility for sentencing lies elsewhere.

Moreover, nothing the trial court said corrected any misimpression left by the prosecution's statements, as the judge made no comment whatsoever pertaining to appellate review. Unlike Jones v. Butler, 864 F.2d 348, 360 (5th Cir. 1988), where the Court of Appeals for the Fifth Circuit held that the prosecutor's statement that "[I]f, in fact, you do return the death penalty . . . yours will not be the last word. Every sentence is reviewed by the Supreme Court," was improper but cured by a prompt curative instruction by the trial judge, here there was no curative instruction.18

Caldwell and its progeny make clear that"the sentencing jury must continue to feel the weight of responsibility so long as it has responsibility." Sawyer, 881 F.2d at 1282. Because the prosecutor's remarks may have misled the jury into thinking the Delaware Supreme Court was the final arbiter of Riley's fate, we conclude that Riley's constitutional rights were violated under Caldwell. Thus, even were we to find that Riley has not shown a Batson violation entitling him to a new trial, we still would direct the District Court to grant the writ of habeas corpus entitling Riley to a new sentencing hearing.

_____

17. At oral argument counsel for the State acknowledged that "[p]erhaps better practice would have been for Liguori to insert the word `limited' " into his reference to automatic appellate review. Tr. of Oral Argument at 50. This could be construed as a concession by the State that Liguori's comments were misleading because of what they did not tell the jury.

18. We are not persuaded by Riley's contention that the trial judge's repeated references to the jury's determination on death as a "recommendation" misled the jury as to its actual responsibility in the sentencing process. See generally Flamer v. Delaware, 68 F.3d 710 (3d Cir. 1995).

III.

CONCLUSION

This is an appropriate case for the issuance of a writ of habeas corpus. One of the principal objections to the operation of the death penalty in this country is that it is applied unevenly, particularly against poor black defendants. Another concern is that because of the complex review process, the jury may not comprehend the significance of its life-or-death decision. Both of these issues are implicated in this case. An appropriate order follows.

49

[This page intentionally left blank]

51

APPENDIX A

Excerpts from Panel Opinion in Riley v. Taylor,
No. 98-9009
Filed January 17, 2001

Panel: SLOVITER, ALITO, and STAPLETON, Circuit  Judges

ALITO, Circuit Judge:

. . .

III.

Riley next argues that adverse publicity prevented him
from obtaining a trial by an impartial jury. He contends,
first, that it should be presumed that he was prejudiced by
pretrial publicity because the record establishes the
existence of a "hostile trial atmosphere" and, second, that
the record shows that several jurors were unable to be
impartial due to exposure to unfavorable pretrial publicity.

A.

"Where media or other community reaction to a crime or
a defendant engenders an atmosphere so hostile and
pervasive as to preclude a rational trial process, a court
reviewing for constitutional error will presume prejudice to
the defendant without reference to an examination of the
attitudes of those who served as the defendant's jurors."
Rock v. Zimmerman, 959 F.2d 1237, 1252 (3d Cir. 1992).
See also Sheppard v. Maxwell, 384 U.S. 333 (1966); Estes
v. Texas, 381 U.S. 532 (1965); Rideau v. Louisiana, 373
U.S. 723 (1963); Flamer v. Delaware, 68 F.3d 736, 755 (3d
Cir. 1995) (en banc). "The community and media reaction,
however, must have been so hostile and so pervasive as to
make it apparent that even the most careful voir dire
process would be unable to assure an impartial jury.. . .
Such cases are exceedingly rare." Rock, 959 F.2d at 1252-
53.

In this case, the state courts made a finding of
impartiality. Such a finding is entitled to deference, see
Patton v. Yount, 467 U.S. 1025, 1031 & n. 7 (1984), and we
find no basis for overturning that finding.

52

Riley relies on a relatively small number of newspaper articles, almost half of which appeared six months or more before the trial. Although two of the articles named Riley as a suspect in Feeley's murder, and although a few of the articles discussed the plight of the Feeley children, who were orphaned by the murder, the articles were not inflammatory. In short, the media coverage was not "so hostile and pervasive as to preclude a rational trial process." Rock, 959 F.2d at 1252.

B.

Because Riley has not shown the presence of circumstances justifying a presumption of prejudice, he "must establish that those who actually served on his jury lacked a capacity to reach a fair and impartial verdict based solely on the evidence they heard in the courtroom." Rock, 959 F.2d at 1253. See also Patton, 467 U.S. at 1035; Irvin v. Dowd, 366 U.S. 717, 723 (1961). "The fact that jury members may have been exposed to press reports or other community reaction concerning the case and even the fact that they may have formed a tentative opinion based on that exposure will not establish a constitutional violation if the trial court has found, with record support, that each of the jurors was able to put aside extrinsic influences." Rock, 959 F.2d at 1253.

Riley contends that two jurors, Leon Morris and Carl Patterson, were unable to be impartial due to exposure to pretrial publicity. We do not agree.

Morris testified during voir dire that he "had read something about" the case in the newspaper at the time of the murder and that he had heard on the radio that the case was "coming to trial." App. 277. The following exchange then occurred:

> Q. . . . . Because of what you read in the newspaper, do you feel that you could sit here as an impartial jury?
>
> A. Yes, because I know nothing of the evidence or anything else.

App. 278.

53

Carl Patterson during voir dire was asked whether anything he had read in the newspaper had created bias or prejudice against the defendant. See App. 294. He responded that he could not remember a lot of what he read in the newspaper. See id. The following colloquy then occurred:

> Q. Then do you know of any reason why you can't render an impartial verdict based solely upon the law and the evidence?
>
> A. No, Your Honor.

Id.

The trial judge implicitly found that these jurors were impartial, and the Delaware Supreme Court agreed on direct appeal. Such implicit findings are entitled to a presumption of correctness. Parke v. Raley, 506 U.S. 20, 35 (1992); Weeks v. Snyder, 2000 WL 975043 (3d Cir. July 17, 2000); Campbell v. Vaughn, 209 F.3d 280, 290 (3d Cir. 2000), and we see no ground for holding that that presumption has been overcome.

IV.

Riley argues that the prosecution violated his right to due process by failing to disclose exculpatory evidence in its possession as required by Brady v. Maryland, 373 U.S. 83 (1963). In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. To state a valid Brady claim, a plaintiff must show that the evidence was (1) suppressed, (2) favorable, and (3) material to the defense. See United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991). Evidence is material if there is a reasonable probability that the outcome would have been different had the evidence been disclosed to the defense. See United States v. Bagley, 473 U.S. 667, 678 (1985). Evidence that may be used to impeach may qualify as Brady material. See Kyles v. Whitley, 514 U.S. 419, 445 (1995); Bagley , 473 U.S. at 676.

54

Riley's Brady argument concerns a wiretap on the telephone of the mother of Tyrone Baxter. Before trial, Riley's lawyer asked the state to produce recordings or transcripts of the intercepted calls, but the state refused, arguing that the tapes contained no exculpatory material. Without listening to the tape himself, the trial judge accepted the prosecutor's representation and denied Riley's motion for production. Throughout the subsequent proceedings in state and federal court, no judge listened to the tapes.

In his briefs in this appeal, Riley made a strong Brady argument. He asserted that between the time of the Feeley murder and Baxter's arrest, "Baxter spoke to his mother on the telephone on several occasions"; that "Baxter's testimony was the State's strongest evidence against" him; and that statements made by Baxter to his mother might have provided valuable impeachment evidence. Appellant's Br. at 5. At a minimum, he contended, the state courts or the District Court should have listened to the tapes in camera to determine whether they contained Brady material.

At oral argument, however, counsel for the appellees represented that an examination of the logs of the wiretap on Mrs. Baxter's telephone did not reveal any intercepted conversations in which Baxter participated. Copies of the logs were provided to Riley's attorneys and to the court, and Riley's attorneys submitted a letter-brief commenting on the contents of the logs. We have examined the logs, and it appears that the state's representation is correct: we see no record of any conversations in which Baxter participated. The revelation that the logs do not mention any such conversations fatally undermines the Brady argument made in Riley's briefs.

In their post-argument letter-brief commenting on the logs, Riley's attorneys advance different arguments to show that an in camera inspection of the wiretap recordings is required. A defendant seeking an in camera inspection to determine whether files contain Brady material must at least make a "plausible showing" that the inspection will reveal material evidence. Pennsylvania v. Ritchie, 480 U.S. 39, 58 n.15 (1987) (quoting United States v. Valenzuela-

55

Bernal, 458 U.S. 858, 867 (1982)). Mere speculation is not enough. United States v. Navarro, 737 F.2d 625, 631 (7th Cir. 1984). The arguments made by Riley's attorneys in their post-argument submission do not satisfy this standard.

Riley's attorneys first note that several log entries "expressly refer to conversations about Tyrone Baxter." 12/16/99 Letter-brief at 3 (emphasis added). But it is unlikely that statements "about" Baxter by third persons –– unlike statements made by Baxter himself –– could have been used to impeach Baxter's testimony or could have been admitted at trial on some other ground. For that reason alone, it is unlikely that these statements are material. See Wood v. Bartholomew, 516 U.S. 1, 5-6 (1995). Moreover, even if the problem of admissibility is put aside, it is pure speculation to suppose that the contents of the statements are in any way exculpatory.

Riley's attorneys also suggest that conversations between Baxter and his mother may have been intercepted and recorded but that the person or persons who compiled the logs may not have recognized Baxter's voice. This, however, is nothing but the purest speculation. We note that the wiretap occurred while the police were seeking to arrest Baxter; they therefore had a strong incentive to identify him if he participated in any of the intercepted conversations. We have considered all of Riley's Brady arguments and find them to be without merit.

V.

Riley argues that he was denied the effective assistance of counsel at the penalty phase of his trial.1 The District Court held that many of Riley's arguments concerning the alleged deficiencies of his attorney's performance were never

_____

1. Riley's amended federal habeas petition raised claims regarding the alleged ineffectiveness of trial counsel at the guilty phase, but the District Court held that these claims were procedurally barred. See Riley VI, 1998 WL 172856, at **18-20. On appeal, Riley refers to these claims in a footnote. See Appellant's Br. at 38 n.16. This footnote is inadequate to raise the issue on appeal.

56

presented to the Delaware Supreme Court and were thus procedurally barred, and the District Court rejected Riley's remaining arguments regarding this matter on the merits. On appeal, Riley attacks both parts of the District Court's holding.

A.

Riley contends that the District Court was required to hold an evidentiary hearing on the question of procedural default for two reasons. First, he maintains that at least some of the arguments that the District Court held were procedurally barred might have been presented to the Delaware Supreme Court during the oral argument of his direct appeal even though those arguments were not contained in his brief. Because the record does not include a transcript of the oral argument, Riley maintains that the District Court should have held an evidentiary hearing for the purpose of reconstructing the record. See Appellant's Br. at 38–39. We disagree.

On direct appeal, Riley was represented by the same attorney who had represented him at trial. In his amended habeas petition, Riley acknowledges that no ineffective assistance argument was made in the direct appeal brief that was ultimately submitted on his behalf and accepted for filing by the Delaware Supreme Court.[2]  See App. 1198. In addition, the opinion issued by the Delaware Supreme Court in the direct appeal makes no mention of ineffective assistance of counsel. See Riley I. Under these circumstances, the District Court was certainly not required to conduct an evidentiary hearing to determine whether the attorney who represented Riley at trial chose at oral argument before the state supreme court to make arguments not mentioned in his brief and to condemn his own performance in the trial court.

_____

2. The first brief submitted by Riley's attorney on direct appeal contained
a conclusory passage that purported to raise the issue of ineffective assistance (without any factual elaboration) for the purpose of preserving the issue. See App. 1198. However, this brief was rejected by the Delaware Supreme Court, and the brief that was ultimately submitted and accepted contained no such passage. See App. 1198–99.

57

With little elaboration, Riley also contends that the District Court should have held an evidentiary hearing so that Riley could show that he had "cause" for not raising the arguments in question in state court. See Appellant's Br. at 39. However, Riley has not even identified any "cause" that he would have attempted to show. We will not reverse the decision of the District Court and order that Court to conduct an evidentiary hearing so that Riley can develop the factual predicate for a "cause" that Riley has not even disclosed.

Perhaps the most frequently asserted "cause" for procedural default is ineffective assistance of counsel, and we will therefore comment briefly on the steps that Riley should have taken if he wished to rely on this "cause." As the District Court pointed out, in order for Riley to show that ineffective assistance provided "cause" for failing to raise the arguments in question in the state court proceedings, Riley would have to show that the new attorney who represented him in the state post-conviction relief proceedings was ineffective. See Dist. Ct. Op. at 50 & n.16, 56-57. This is so because Delaware permits a claim of ineffective assistance to be raised in a post-conviction relief proceeding even if it was not raised on direct appeal. See Riley VI, 1998 WL 172856, at **17-18 & n.16. 3

Riley has not argued, however, that the attorney who represented him in the state post-conviction relief proceedings provided ineffective assistance by failing to make the specific arguments that the District Court held were procedurally barred.4 Moreover, because Riley never raised a claim in state court that his post-conviction relief attorney was ineffective, he runs afoul of the rule that "a

---

3. Indeed, in Riley's case, ineffective assistance was vigorously argued in
the post-conviction relief proceedings, and the Delaware Supreme Court addressed these arguments on the merits. See Riley V, 585 A.2d at 726-29.

4. Even if Riley had asserted a "cause" for the procedural default, he would have to confront the rule that a habeas petitioner is not entitled to an evidentiary hearing in federal court to establish a factual record unless the petitioner can show "cause" for not making the necessary factual record in the state proceedings. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992).

petitioner must demonstrate independent cause and prejudice excusing the default of the ineffectiveness claim before that claim can be assessed as cause in relation to a second, substantive claim." Hill v. Jones, 81 F.3d 1015, 1030 (11th Cir. 1996). See also Justus v. Murray , 897 F.2d 709, 713 (4th Cir. 1990).

B.

We will now discuss the ineffective assistance arguments that were not procedurally defaulted. In order to show that his constitutional right to the assistance of counsel was violated at the penalty phase, Riley must satisfy the two-pronged test of Strickland v. Washington, 466 U.S. 668, 687 (1984). First, he must demonstrate that his attorney"made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after . . . [an] adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. Second, if counsel's representation is shown to fall outside"the wide range of reasonable professional assistance," id., it must be shown that "the deficient performance prejudiced the defense," that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id . at 694.

1. In his brief in our court, Riley presented a greatly truncated version of arguments previously advanced regarding trial counsel's failure to call certain family members to testify at the penalty phase of the trial and trial counsel's failure to locate or contact other family members who might have testified. All of these family members, Riley argues, could have provided evidence about his traumatic experiences as a child and his "severely dysfunctional family." Appellant's Br. at 41.

The Superior Court, the Delaware Supreme Court, and the District Court all addressed these arguments in some

59

detail and rejected them. They concluded that Riley's trial attorney made reasonable efforts to find certain family members who could not be located, that he did not act unreasonably in failing to call others as witnesses, and that his failure to rely on what was termed Riley's "social history" represented a reasonable strategy. See Riley II, 1988 WL 47076 at *3-4, *7-9; Riley V, 585 A.2d at 726-28; Riley VI, 1998 WL 172856, at **20-23.

In his brief in our court, Riley merely states without elaboration that "trial counsel failed to call as witnesses members of Mr. Riley's immediate family, several of whom lived within a few hours of Dover, Delaware" and that these witnesses could have testified about his childhood and family. Appellant's Br. at 41. He provides no response to the detailed reasons given by the state courts and the District Court for holding that trial counsel was not ineffective in failing to call or locate family members for the purpose of eliciting testimony about Riley's childhood and family.

Nothing has been presented that convinces us that the state courts and the District Court erred. We agree with the state courts and the District Court that Riley has not shown that trial counsel was ineffective in failing to call those family members who could be located, such as Riley's mother. The District Court analyzed trial counsel's decision not to put Riley's mother on the stand as follows:

> The record is replete with circumstances that support trial counsel's decision not to call Petitioner's mother. First, Petitioner informed trial counsel that he did not wish to expose his mother's problems at trial. . . . Second, trial counsel testified that Petitioner's mother refused to support Petitioner's alibi, and as a result, he was concerned about the prosecutor's cross-examination of her during the penalty phase. . . . Third, the record indicates that Petitioner's mother had a severe drinking problem and was drinking heavily at the time of the trial. . . . As a result, trial counsel believed that the witnesses that he chose to call in mitigation, instead, would make a better impression on the jury. . . . Under these circumstances, the Court finds trial counsel's decision not to call Petitioner's

> mother to be reasonable and within the bounds of his
> strategic discretion.

Riley VI, 1998 WL 172856, at *2. We agree.

We also agree that Riley has not demonstrated that his trial attorney was ineffective in failing to locate certain other family members. See Riley II, **3-5; Riley V, 585 A.2d at 727-28; Riley VI, 1998 WL 172856, at *21. Finally, we agree that a strategy of not introducing evidence regarding Riley's background and family fell within "the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. The Superior Court wrote as follows:

> The adverse inferences to be drawn from the fact that
> defendant's parents were both alcoholics, his sister an
> unwed mother of three, his brother an incarcerated
> criminal and his home life a series of jails and
> temporary living quarters would no doubt have been
> magnified in the semi-rural county where this case was
> tried . . . . Likewise, it is certainly within the range of
> strategic choices to forego mitigating evidence, which
> may be seen as "excuse making" and rely upon a plea
> for mercy . . . . In Riley's case, evidence offered as to
> mitigating circumstances included: that the actual
> killer was Tyrone Baxter, the co-defendant; that Baxter
> received a less severe penalty; and that Riley's
> background indicated that he was a diligent worker,
> possessing a non-violent and good character.
>
> In this case, trial counsel gave a strong argument that
> Riley's life should be spared in light of the fact that
> Tyrone Baxter, defendant's accomplice and principal
> accuser, would be spared the death penalty as the
> result of a plea bargain. Moreover, Walter Ross testified
> without contradiction at the [post-conviction relief]
> hearing that the defendant did not want his family
> background discussed at the penalty phase. Given
> defendant's wishes, the lack of positive evidence in
> mitigation, counsel's focused argument for leniency in
> light of Baxter's plea bargain, and the potentially
> negative impact the purportedly positive evidence
> would have wrought before the jury, defendant has
> failed to show that counsel's decision to limit the

61

testimony at the penalty phase was constitutionally deficient.

Riley II, 1988 WL 47076, at *11-12. This analysis was accepted by the Delaware Supreme Court and the District Court. We cannot disagree.

2. Riley contends that his trial attorney was ineffective because he did not present testimony by a mental health expert. Riley relies on the affidavits of two experts, who examined him in connection with the post-conviction relief proceeding. One of the experts characterized Riley as a person with "borderline defective" intelligence whose capacity "for objectively analyzing events, circumstances and relationships [is] narrowed by stress and complexity." Appellant's Br. at 42. We agree with Riley that this explanation might have been helpful at the penalty phase. The question remains, however, whether trial counsel was ineffective in failing to obtain such evidence at the time.

In the post-conviction relief proceeding in Superior Court, trial counsel testified that he did not seek to have Riley examined by a mental health expert because he had no reason to think, in light of his conversations with Riley, that such an examination would have revealed anything useful. See App. 592-96. He testified that Riley appeared to understand what they discussed and that Riley prepared and filed some motions on his own behalf. See App. 592-93. Trial counsel stated that Riley never mentioned any head injury or any psychological problems. See App. 590. Relying on this testimony, the Superior Court found that trial counsel "had no inkling that evaluation of Mr. Riley's mental or emotional state might be helpful in mitigation." Riley II, 1988 WL 47076, at *7.

Before us, Riley has not argued that counsel in a capital case must always seek a mental examination of the defendant, and cases from other circuits reject that proposition. Instead, they hold that a case-by-case determination must be made and that counsel is not ineffective if he or she has no reason to think that a mental examination would be useful. See Thomas v. Gilmore, 144 F.3d 513, 515-16 (7th Cir. 1998); United States v. Miller, 907 F.2d 994, 998-99 (10th Cir. 1990); United States ex rel. Rivera v. Franzen, 794 F.2d 314, 317 (7th Cir. 1986).

62

Under this standard, we see no ground for reversing the decision of the District Court here. Riley has simply not identified any fact that should have alerted his trial attorney that he had mental problems that might have provided the basis for mitigation. The only fact even mentioned in Riley's briefs is the "implausible" nature of Riley's alibi, see Reply Br. at 21, but this is insufficient to alert counsel to the possibility of mental problems that might be relevant to mitigation. For the most part, Riley merely notes what the subsequent examinations by mental health experts revealed. However, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

3. Finally, Riley cites trial counsel's inexperience and the fact that he spent only 14 hours preparing for the penalty phase of the trial. These facts are not comforting, but they do not in themselves establish that counsel was ineffective. We have taken them into account in evaluating the other deficiencies properly asserted in this appeal. We cannot say, however, that Riley's constitutional right to the effective assistance of counsel was denied.

VI.

Relying on Ake v. Oklahoma, 470 U.S. 68, 76-77 (1985), Riley argues that his right to due process was violated because the trial judge refused to appoint co-counsel or an investigator to assist his attorney. Riley again notes the inexperience of his attorney, and he asserts that co-counsel had been appointed in Kent County in prior capital cases. Although Riley claims that the lack of co-counsel and an investigator caused him "extreme prejudice," his brief provides no details.

A. We turn first to Riley's argument that he was constitutionally entitled to the appointment of co-counsel. In some jurisdictions, there is a statutory right to the appointment of two defense attorneys in capital cases. See, e.g., 18 U.S.C. S 3005. However, we are aware of no

63

authority holding that the federal Constitution confers such a right, and we see no basis for such a holding. The Constitution specifies the quality of representation that all criminal defendants, including capital defendants, must receive, namely, "reasonably effective assistance." Strickland, 466 U.S. at 687. The Constitution does not specify the number of lawyers who must be appointed. If a single attorney provides reasonably effective assistance, the Constitution is satisfied, and if a whole team of lawyers fails to provide such assistance, the Constitution is violated. Thus, there is no constitutional right per se to the appointment of co-counsel in a capital case. Bell v. Watkins, 692 F.2d 999, 1009 (5th Cir. 1982); Jimenez v. State, 703 So. 2d 437, 439 (Fla. 1997) (per curiam); State v. Phelps, 478 S.E.2d 563, 574-75 (W.Va. 1996) (per curiam); State v. Rodriguez, 921 P.2d 643, 652 (Ariz. 1996); Spranger v. State, 650 N.E.2d 1117, 1122-23 (Ind. 1995); Uptergrove v. State, 881 S.W.2d 529, 531 (Tex. Ct. App. 1994). Cf. Hatch v. Oklahoma, 58 F.3d 1447, 1456 (10th Cir. 1995).

Riley's brief does not identify any unusual features of this case that demanded the appointment of a second attorney. While he does cite the inexperience of his trial attorney, without a showing that this attorney did not provide the level of representation required by the Constitution, we cannot hold that the failure to appoint co-counsel to assist him violated the Constitution.

B. We must also reject Riley's argument that the failure to appoint a private investigator violated the Constitution. In Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985), the Supreme Court made it clear that there is no constitutional right to the appointment of an investigator where the defendant offers "little more than undeveloped assertions that the requested assistance would be beneficial." See also Gray v. Thompson, 58 F.3d 59, 66-67 (4th Cir. 1995), vacated on other grounds sub nom. Gray v. Netherland, 518 U.S. 152 (1996). Riley has offered nothing more here.

. . .

VIII.

Riley contends that the trial judge contravened the holding of Witherspoon v. Illinois, 391 U.S. 510 (1968), when the judge dismissed two jurors for cause after they responded to voir dire questions concerning capital punishment. In Witherspoon, the Supreme Court held that members of a jury panel may not be excused for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id. at 522. Some lower courts, however, interpreted footnotes in Witherspoon to mean that potential jurors could be dismissed only if they stated unambiguously that they would automatically vote against the death penalty.5

The Supreme Court clarified the meaning of Witherspoon in Wainwright v. Witt, 469 U.S. 412 (1985). The Court held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " Id. at 424 (quoting Witherspoon, 391 U.S. at 45). The Court noted:

> [T]his standard . . . does not require that a juror's bias be proved with `unmistakable clarity' . . . because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

_____

5. See Wainwright v. Witt, 469 U.S. 412, 419 (1985).

Id. at 424-26 (footnote omitted). The Court went on to hold that a trial judge's finding under this standard is entitled to the presumption of correctness in 28 U.S.C. S 2254(d).6 469 U.S. at 428. Applying these standards, the Court sustained the dismissal of a juror who said, when asked whether her beliefs would interfere with her sitting as a juror in a capital case, "I am afraid it would" and "I think it would." Id. at 416.

The two potential jurors at issue in the present case are Mae Floyd and Gerald Mood. During Floyd's voir dire, the following exchange occurred:

> The Court: . . . Do you have any conscientious scruples against finding a verdict of guilty where the punishment might be death or against imposing the death penalty if the evidence should so warrant?
>
> Ms. Floyd: I would say yes, I think so.
>
> The Court: You do have conscientious scruples?
>
> Ms. Floyd: Yes.
>
> The Court: Regardless of any personal beliefs or feelings you have, if the evidence justified it, would you be able to find a person guilty of murder in the first degree and impose the death penalty?
>
> Ms. Floyd: That is a hard one to tell you the truth.
>
> The Court: I will repeat the question.
>
> Ms. Floyd: I heard it. All right. Repeat the question.
>
> The Court: I will repeat it. Regardless of your personal belief or feelings, if the evidence justified it, would you be able to find a person guilty of murder in the first degree and would you be able to impose the death penalty?

_____

6. See also Deputy v. Taylor, 19 F.3d 1485, 1498 (3d Cir. 1994) (citations omitted) (internal quotation marks omitted)("a trial court may excuse a juror for cause where such juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. . . . [and] that a state trial judge's finding that
a prospective juror is impermissibly biased against the death penalty is entitled to a presumption of correctness under S 28 U.S.C.A. 2254(d).").

Ms. Floyd: That is a two-part question, right?

The Court: Yes, it is.

Ms. Floyd: The latter part--

The Court: First of all, would you be able to find a person guilty of murder in the first degree?

Ms. Floyd: I may, yes.

The Court: And the second part is would you be able to impose the death penalty?

Ms. Floyd: I tell you the truth I don't think so.

The Court: I will excuse you. Thank you very much.

App. 285-86 (emphasis added).

As both the Delaware Supreme Court and the District Court observed, Floyd's responses were very similar to those of the potential juror in question in Wainwright v. Witt, supra. See Riley I, 496 A.2d at 1005-06 Riley VI, 1998 WL 172856, at *11. We agree with their analysis and hold that Riley has not overcome the presumption of correctness that attaches to the implicit finding of the trial judge.

The dismissal of the other potential juror in question, Gerald Mood, took place after the following colloquy:

The Court: . . . . Do you have any conscientious scruples against finding a verdict of guilty when the punishment might be death or against imposing the death penalty if the evidence should so warrant?

Mr. Mood: I don't know. I have mixed emotions about that.

The Court: Regardless of any personal belief or feelings that you have, if the evidence justified it, would you be able to find a person guilty of murder in the first degree and would you be able to impose the death penalty?

Mr. Mood: Maybe I could. I don't really know.

The Court: I am going to excuse you sir . . . .

App. 276.

67

The District Judge aptly analyzed the dismissal of Mood, and we adopt his analysis:[7]

> Unlike venireperson Floyd, venireperson Mood's responses were much more succinct. Mood twice responded to the trial court's capital punishment questions with the phrase, "I don't know." . ... . Particularly in situations such as this, where an individual's record response is so brief that its printed reproduction reveals little, the Court should defer to those credibility factors that would only have been known to the trial court, such as the juror's demeanor, tone of voice and attitude. See Witt, 469 U.S. at 434 (emphasizing importance of trial court's assessment of venireperson's demeanor, particularly where printed record may not be "crystal clear"). Accordingly, the Court finds adequate record support for the trial court's decision to excuse venireperson Mood.

Riley VI, 1998 WL 172856, at *12.

IX.

Relying on Morgan v. Illinois, 504 U.S. 719 (1992), Riley argues that the trial judge erred in failing sua sponte to ask prospective jurors during voir dire whether they would automatically impose the death penalty if they found him guilty. The District Court rejected this claim on the ground that Morgan requires that such questions be asked only if the defense so requests. We agree.

In Morgan, the Supreme Court framed the relevant issue in these terms: "whether on voir dire the court must, on defendant's request, inquire into the prospective jurors' views on capital punishment." 504 U.S. at 726 (emphasis added). The Court stated its holding as follows:

_____

7. In addition, as the District Court noted, some of the answers given by Floyd and Mood to questions not concerning capital punishment may have influenced the trial judge's decision to dismiss them. Floyd revealed that she knew Tyrone Baxter and was a casual friend of Baxter's mother. Mood said that he was a good friend of one of the police officers involved in the case and had served with him in the fire department. See Riley VI, 1998 WL 172856, at *12.

68

>Petitioner was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty.

Id. at 736 (emphasis added). The dissent described the Court's holding in similar language: "The Court today holds that . . . the Constitution requires that voir dire directed to [reverse-Witherspoon] `bias' be provided upon the defendant's request." Id. at 739 (Scalia, J., dissenting) (emphasis added).

We cannot regard the Court's choice of words as accidental, and we think that the holding of Morgan is clear: a reverse-Witherspoon inquiry must be made "on defendant's request." See United States v. Tipton, 90 F.3d 861, 879 (4th Cir. 1996).

Riley makes two arguments in response. First, he notes that the state supreme court rejected his argument on the merits, and he contends that "the State should not now be heard to raise alleged procedural bars to federal court resolution of the claim on the merits." Appellant's Br. at 52. Our holding, however, has nothing to do with a procedural bar, i.e., a state rule of procedure that bars a federal habeas court from reaching the merits of a federal claim. Rather, our holding is based on the fact that the constitutional right recognized in Morgan applies only if the defense makes a request for a reverse-Witherspoon inquiry.

Second, Riley argues that his trial attorney was ineffective in failing to request reverse-Witherspoon questioning. However, this argument was not made in the state courts, and it is thus procedurally barred.

X.

Under 11 Del. C. S 4209(g)(2), the Delaware Supreme Court is required to undertake a proportionality review in death penalty cases. The statute mandates that the Court inquire into whether "the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in

69

similar cases." 11 Del. C. S 4209(g)(2)(a). In affirming Riley's
death sentence, the Delaware Supreme Court examined 21
cases, including five in which the death penalty was
imposed. It found that Riley's case was comparable to the
five death penalty cases (Whalen, Rush, Deputy, Flamer
and Bailey), because they all involved

> an unprovoked, cold-blooded murder of a helpless
> person (or persons) committed upon victims lacking the
> ability to defend themselves and solely for the purposes
> of pecuniary gain (except in Whalen's case). In none of
> these killings is there any evidence of provocation or of
> homicide committed out of passion or rage. In each
> case, except Whalen, the murder occurred in the court
> of a robbery that was deliberately planned and carried
> out with the use of deadly weapons. In each case, the
> perpetrators of these crimes offered no extenuating
> circumstance for taking the life of another.

Riley I, 496 A.2d at 1027.

Riley challenges this finding on two grounds. First, he
points to the fact that two of the death sentences relied on
-- Rush and Whalen -- had been vacated. Second, he
argues that the remaining cases -- Deputy, Bailey, and
Flamer -- do not furnish appropriate comparisons because
each involved the killing of more than one person. He
maintains that these errors violated the Eighth and
Fourteenth Amendments.

It is clear that proportionality review is not required by
the federal Constitution. See Pulley v. Harris , 465 U.S. 37,
50-51 (1984). Riley justifies advancing his proportionality
argument in federal court on two grounds.[8]  First, he argues
that the allegedly improper review resulted in a punishment
that was "inherently disproportionate and, therefore,
arbitrary and capricious" in violation of the Eighth
Amendment. Appellant's Br. at 56. Second, he argues that

_____

8. Ordinarily, federal habeas relief is not available for an error of
state
law: the habeas statute provides that a writ disturbing a state court
judgment may issue only if a prisoner is in custody"in violation of the
Constitution or laws or treaties of the United States." 28 U.S.C.
S 2241(c)(3). See Pulley v. Harris, 465 U.S. 37, 41 (1984).

Delaware's failure to abide by its own statutory scheme for proportionality review violated due process. See Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993) ("the failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state").

Riley bases his first argument on the principle that"[i]f a State has determined that death should be an available penalty for certain crimes, then it must administer the penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." Spaziano v. Florida, 468 U.S. 447, 460 (1984). Riley claims that the proportionality review conducted by the Delaware Supreme Court in his case failed to protect him from arbitrary imposition of the death penalty, and in fact upheld a disproportionate punishment. This argument rests on the premise that applying the death penalty in Riley's case would be so disproportionate as to constitute cruel and unusual punishment under the Eighth Amendment. Therefore, Riley's argument really attacks the imposition of the penalty itself, rather than the state's method of reviewing proportionality.

Riley's argument is not tenable. The Supreme Court has "occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime." Pulley, 465 U.S. at 43. However, in this case, Riley's crime-- killing a defenseless person without provocation in the course of an armed robbery -- is not such that application of the death penalty in these circumstances would"shock the conscience." See Lindsey v. Smith, 820 F.2d 1137, 1154 (11th Cir. 1987); Spinkellink v. Wainwright, 578 F.2d 582, 606 n.28 (5th Cir. 1976). Riley has thus failed to show an Eighth Amendment violation.

Riley's second argument is based on the principle that when a state creates a right, the Due Process clause of the Fourteenth Amendment entitles a defendant to procedures to ensure that the right is not arbitrarily denied. He argues that the Delaware Supreme Court, by failing to conduct an

71

adequate proportionality review as required by state
statute, denied him due process.

As a threshold matter, it is unclear whether, under Third
Circuit law, a state proportionality-review statute creates
any cognizable liberty interest for due process purposes.
See Frey v. Fulcomer, 132 F.3d 916, 925 n.7 (3d Cir. 1997)
(noting that Supreme Court precedent on this issue is in
flux). We need not address this question, however, because
even if Riley has such a liberty interest, he has not shown
any denial of due process. In evaluating a claim that a state
court erred in conducting its proportionality review, a
federal court may only inquire into whether the state court
"undertook its proportionality review in good faith and
found that [the defendant's] sentence was proportional to
the sentences imposed in cases similar to his." Walton v.
Arizona, 497 U.S. 639, 656 (1990). Because there is no
federal constitutional right to proportionality review, if the
federal court finds that the review was undertaken in good
faith, it cannot "look behind" the state court's conclusion of
proportionality to consider whether the state court
misapplied state proportionality law. See id.; Bannister v.
Delo, 100 F.3d 610, 627 (8th Cir. 1996). In this case, the
Delaware Supreme Court compared Riley's case with a
substantial number of other death-eligible cases, and, even
disregarding the two vacated death sentences, it found
common characteristics between Riley's case and three
other cases in which the sentence was not vacated.
Although Riley argues that these cases are not entirely
analogous, because each contained an additional
aggravating factor (more than one victim), there is no
indication that the Delaware court acted in bad faith in
conducting its review. We are thus without power to order
habeas relief.

XI.

We now turn to Riley's contentions concerning jury
instructions given by the trial judge at the sentencing
phase.

A.

Riley argues that the jury instructions at the penalty
phase impermissibly restricted the jury's consideration of

72

mitigating circumstances. He takes issue with the following
instruction, issued at the start of the penalty hearing:

>    A sentence of death shall not be imposed unless the
>    jury finds:
>
>    (1) Beyond a reasonable doubt at least one statutory
>    aggravating circumstance; and
>
>    (2) Unanimously recommends, after weighing all
>    relevant evidence in aggravation or mitigation
>    which bears upon the particular circumstances or
>    details of the commission of the offense and the
>    character and propensities of the offender, that a
>    sentence of death shall be imposed. Where the
>    jury submits such a finding and recommendation,
>    the Court shall sentence the defendant to death. A
>    finding by the jury of a statutory aggravating
>    circumstance, and a consequent recommendation of
>    death, supported by the evidence, shall be binding
>    on the Court.

App. 392 (emphasis added). Riley contends that, given the
placement of the word "consequent," "a reasonable jury
could understand the underscored sentence to mean that
the effect of a finding that a statutory aggravating
circumstance existed, is that the death penalty must be
imposed." Appellant's Br. 59. Because the trial judge had
previously informed the jury that the statutory aggravating
circumstance -- commission of the murder during a
robbery -- had already been proven beyond a reasonable
doubt in the guilt phase, Riley argues that a reasonable
jury could have read the instruction to mean that it need
not consider mitigation evidence.

When reviewing a jury instruction that is claimed to
impermissibly restrict a jury's consideration of relevant
evidence, a court must ask "whether there is a reasonable
likelihood that the jury has applied the challenged
instruction in a way that prevents the consideration of
constitutionally relevant evidence." Boyde v. California, 494
U.S. 370, 380 (1990). If there is "only a possibility" of such
inhibition, however, the challenge must fail. Id . Moreover,
the challenged instructions "must be evaluated not in

73

isolation but in the context of the entire charge." Jones v. United States, 527 U.S. 373, 391 (1999).

When the jury charge is read as a whole, there is no reasonable likelihood that a jury could have understood it to preclude consideration of mitigating circumstances. At the close of the penalty hearing, the court again instructed the jury in terms that cleared up any ambiguity that might have been present in its earlier instruction:

> In conclusion, a sentence of death shall not be imposed unless you, the jury, find:
>
> (1) Beyond a reasonable doubt at least one statutory aggravating circumstance has been established; and
>
> (2) Unanimously recommend that a sentence of death be imposed after weighing all relevant evidence in aggravation and mitigation which bear upon the particular circumstances and details of the commission of the offense and the character and propensities of the offender.
>
> Should you fail to agree unanimously to either of these two matters, the Court shall sentence the defendant to life imprisonment without benefit of probation or parole.

App. 438-40 (emphasis added).

This instruction made it clear that a jury was required both to find at least one statutory aggravator and to weigh aggravating factors against mitigating factors in order to support a death sentence. This belies Riley's argument that the jury was misled into believing that its job was done once the felony murder aggravator was found.

B.

Riley next takes issue with the trial court's failure at the penalty phase to instruct the jury that it was required to conclude unanimously that aggravating circumstances outweigh mitigating circumstances before imposing death, as required by Delaware law. See Whalen v. State , 492 A.2d 552, 560 (Del. 1985) (setting forth "outweighing" standard).

74

Rather, the court simply instructed the jury that it had to "[u]nanimously recommend that a sentence of death be imposed after weighing all relevant evidence in aggravation and mitigation." App. 438; see also App. 392, 437.

This argument provides no grounds for habeas relief. The federal Constitution does not require "specific standards for balancing aggravating against mitigating circumstances." Zant v. Stephens, 462 U.S. 862, 876 n.13 (1983). As long as a jury is permitted to consider all relevant mitigating circumstances in making its death recommendation, there is no federal constitutional problem. In addition, Riley has not suggested how a jury's decision would be any different under the language the court used in this case. Because the jury was instructed not to make a sentencing recommendation until after it had "weigh[ed] all relevant evidence in aggravation and mitigation," the necessary inference was that the death penalty should be imposed only if aggravating factors outweighed mitigating factors (otherwise, the entire "weighing" process would be meaningless).

C.

Finally, Riley argues that the penalty phase instructions improperly suggested that the jury had to be unanimous in imposing a life sentence, in violation of Whalen v. State, 492 A.2d 552, 562 (Del. 1985). He points to the instruction that "[i]f you are not unanimous in your recommendation to impose the death penalty, or you cannot agree unanimously as to your recommendation, then the Court is bound to impose a sentence of life." App. 438 (emphasis added). The word "recommendation" in the underlined phrase, he suggests, could be read to refer to a life sentence recommendation as well as to a recommendation of death.

As a threshold issue, the government argues that Riley failed to raise this issue before the District Court because he based his argument there "solely on the interpretation of the interrogatories posed to the jury" rather than on the jury instruction he points to here. Appellee's Br. at 75. However, Riley, although pointing specifically to the interrogatories to support his point, nevertheless raised the

75

general argument in his amended petition that "the instructions were likely to confuse the jury about whether the verdict must be unanimous." App. 1191. This is sufficient to preserve his argument before this Court.

On the merits, however, Riley's claim must fail. First, when the jury charge is viewed as a whole, it reveals several instances in which the word "unanimous" was explicitly paired solely with the death recommendation. In light of this pattern, it appears unlikely that the jury would have viewed the isolated passage that Riley relies on as extending the unanimity requirement to a recommendation of life imprisonment. Second, the Delaware Supreme Court, in reviewing this allegation, stated that it was "satisfied that the jury understood that, in the event of its failure to unanimously agree upon imposition of a death penalty, an imposition of life imprisonment would result." Riley V, 585 A.2d at 725. Because the instruction made clear that the default rule in case of a lack of unanimity was life imprisonment, it is hard to see how the jury's deliberations would have been affected even had it adopted Riley's interpretation of the instruction. Finally, the challenged instruction was identical to one approved by the Delaware Supreme Court in Flamer v. State, 490 A.2d 104 (Del. 1984), aff 'd sub nom. Flamer v. Delaware, 68 F.3d 710 (3d Cir. 1995) and Flamer v. Delaware, 68 F.2d 736 (3d Cir. 1995) (en banc). The Delaware Supreme Court explicitly pointed to the similarities with Flamer, and distinguished the instructions from those in Whalen, in upholding the death sentence on direct appeal. See Riley, 585 A.2d at 722–25. For these reasons, we reject Riley's claim.

XII.

Riley was convicted of intentional murder and felony murder, with the underlying felony being first-degree robbery. The statutory aggravating circumstance relied on for the death sentence was that the murder was committed while Riley was engaged in the commission of first degree robbery. See 11 Del. C. S 4209(e)(1)(j) (establishing felony murder aggravator). Riley argues that it is unconstitutional to double-count robbery as both an element of the crime

76

(felony murder) that made Riley death-eligible and as a statutory aggravating circumstance.

This Court rejected precisely the same claim in Deputy v. Taylor, 19 F.3d 1485,1502 (3d Cir. 1994), holding that "within the context of Delaware's death penalty statute, the provision requiring the double-counting of the felony at the guilty phase and sentencing phase does not impermissibly weaken the statute's constitutionally mandated narrowing function." This precedent binds our panel.

XIII.

Riley's final argument is that the District Court erred in denying his motion for funds for investigative and expert assistance and in refusing to conduct an evidentiary hearing. We disagree.

A.

Under 18 U.S.C. S 3006A(e) and 21 U.S.C. S 848(q)(4)(B) and (9), Riley was entitled to investigative and expert assistance upon a finding that such assistance was "necessary" or "reasonably necessary" with respect to his representation in the habeas proceeding. Riley sought the services of an investigator to gather additional evidence concerning his childhood experiences. He sought the services of a forensic psychiatrist to develop further mitigating evidence concerning his mental problems. All of these services were requested in order to support Riley's arguments that his trial attorney was ineffective at the penalty phase and that the trial judge should have appointed a co-counsel and investigator to assist him.

Riley has not shown that the services in question were "necessary" or "reasonably necessary." The discovery at the time of the federal habeas proceeding of new evidence about Riley's childhood would not have shown that the efforts of Riley's trial attorney to locate family members who might have testified about such matters were objectively unreasonable. See pages 38-41, supra. Nor would the discovery of such evidence have demonstrated that it was strategically unreasonable for Riley's trial attorney to

77

eschew a penalty–phase defense based on Riley's"social history." See id. Similarly, the development of additional evidence regarding Riley's mental condition at the time of the federal habeas proceeding would not have shown that Riley's trial attorney was objectively unreasonable in not seeking a mental examination prior to the penalty. See pages 41–43, supra.

B.

"Where the District Court denies the petition for a writ of habeas corpus in the absence of an evidentiary hearing," we ask, first, "whether the petitioner asserts facts which entitle him to relief " and, second, "whether an evidentiary hearing is needed." Todaro v. Fulcomer, 944 F.2d 1079, 1082 (3d Cir. 1991). See also Heiser v. Ryan, 951 F.2d 559, 561 (3d Cir. 1991). Riley argues that the District Court should have held an evidentiary hearing concerning the prosecution's peremptory challenges, the impartiality of the jury, his Brady claim, and other unspecified issues. We disagree. As previously discussed, we are required to accept the state courts' findings regarding the peremptory challenges and the impartiality of the jury, and those findings are dispositive. Thus, an evidentiary hearing in federal court on those matters was not needed. In addition, in light of the revelation after briefing that no conversation in which Baxter participated is listed in the logs of the wiretap on Mrs. Baxter's telephone, it is clear that there was no need for an evidentiary hearing concerning Riley's Brady claim. Nor do we believe that the District Court was an evidentiary hearing was needed on any other matter.

BECKER, Chief Judge, Concurring in the Judgment.

This en banc appeal ultimately turns on the petitioner's Batson claim. Unfortunately, I find myself unable to join in either Judge Sloviter's or Judge Alito's opinion on that issue.[1]

First, I cannot agree with Judge Sloviter's treatment of the prosecution's challenge to prospective juror Nichols. Rather, I agree with Judge Alito's opinion on this issue, see Dis. Op. at 83-91, largely because I do not share Judge Sloviter's skepticism of the prosecutor's testimony as to Nichols's "significant pause." Human memory can be quite powerful, and I think it entirely possible that this "significant pause" became indelibly etched in the prosecutor's mind. As explicated by the dissent, the hearing judge determined that the prosecutor's testimony on this matter was credible, and I cannot agree that the race-neutral reason proffered for striking Nichols was "not fairly supported by the record." 28 U.S.C. S 2254(d)(8) (1988).

On the other hand, while the point is quite close, I cannot bring myself to join Judge Alito's discussion of the challenge to prospective juror McGuire. Unlike the challenge to Nichols, an action for which the prosecutor relied on his memory to articulate a race-neutral explanation, the prosecutor had no recollection whatsoever about the differences between McGuire and Reed. I therefore agree with Judge Sloviter that there is no basis in the record for distinguishing McGuire, a prospective black juror who was struck, from Reed, a white man who was not struck and who ultimately served on the jury. While ideally this issue would be developed further at a federal habeas hearing, I reluctantly conclude, again agreeing with Judge Sloviter, that no purpose would be served by having such a hearing at this late date. Accordingly, I will join in the judgment accompanying her opinion.

While I might end at this point, I am impelled to comment on the statistical evidence by reason of the prominent discussion of the issue in the Sloviter and Alito opinions, and the fact that Judge Alito's dissent identifies

_____

1. I do, however, join in Part II of Judge Alito's opinion, dealing with the
Caldwell issue.

79

significant problems with Judge Sloviter's discussion of that evidence. I feel myself unable to join in Judge Alito's opinion on that facet of the case for he has not allayed my concern about the practices of the Kent County prosecutor's office at times relevant here. Specifically, the absence of black jurors on four juries in a county that was 18% black and had a jury venire that was 9% black remains troubling. As the Supreme Court has observed in other contexts when presented with perhaps imperfect statistical data, "[F]ine tuning of the statistics could not have obscured the glaring absence of minoriti[ies]. . . . [T]he . . . inability to rebut the inference of discrimination came not from a misuse of statistics, but from the inexorable zero." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 342 n.23 (1977) (internal quotations omitted).

This concern is exacerbated for me by the State's failure to submit rebuttal evidence. If Riley's data was too weak to support an inference of discrimination in the face of the prosecutor's race-neutral explanations, there was no burden on the government to submit rebuttal data. However, as Judge Sloviter's discussion of the chronology of events makes clear, the State volunteered to provide rebuttal data, and then failed to do so. See Op. of the Court at 38. If the hearing judge had acknowledged the State's failure to provide evidence notwithstanding its promise and then specifically said that he did not consider this failure to be sufficiently probative to overcome the credibility determination, his factual conclusion would be fait accompli. But the fact that the hearing judge did not mention the State's failure to provide evidence, in the wake of the "volunteering," sticks out like a sore thumb, and renders it doubtful for me that the "record as a whole" supports the hearing judge's conclusion.

Judge Sloviter seems to concede that a federal habeas hearing would give Riley ample time to conduct an expert statistical analysis of the complete record, time which he lacked at the earlier hearing, as she explains, because of the State's late decision not to submit any statistical evidence. See Op. of the Court at 38. Were the statistical evidence dispositive of Riley's Batson claim, I would remand for a federal habeas hearing. Judge Sloviter, however,

80

states that the statistical evidence is "relevant but not dispositive to our decision." Op. of the Court at 40. Because I accept her representation on this matter, I do not press the issue further, and simply join in the judgment accompanying her opinion.2

_____

2. I note that, even if I did not agree with Judge Sloviter on the juror McGuire issue, the judgment accompanying her opinion is plainly closer to my own position than the views of Judge Alito. Under these circumstances, I would vote with her anyhow to avoid a stalemate. See Screws v. United States, 325 U.S. 91, 134 (1945) (Rutledge, J., concurring); see also Olmstead v. L.C., 527 U.S. 581, 607–08 (1999) (Stevens, J., concurring); Bragdon v. Abbott, 524 U.S. 624, 656 (1998) (Stevens, J., concurring); AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 225 (2d Cir. 2000) (Jacobs, J., concurring).

ALITO, Circuit Judge, with whom Judges SCIRICA, BARRY,
FUENTES and STAPLETON join as to Part I, and with
whom Chief Judge BECKER, and Judges BARRY, and
STAPLETON join as to Part II, dissenting:

This is a troubling case, but after considering all of the
petitioner's arguments and applying the standard of review
prescribed by the federal habeas statute, I see no ground
for reversing the decision of the district court. The majority
holds that the petitioner's rights under Batson v. Kentucky,
476 U.S. 79 (1986), were violated, but I do not believe that
there is a proper basis for disturbing the credibility findings
made by the conscientious state judge. The majority also
holds that comments made by the prosecutor in closing
argument at the penalty phase of the trial violated Caldwell
v. Mississippi, 472 U.S. 320 (1985), but in my view the
majority misinterprets that decision as in effect embodying
a per se prohibition against any mention of the availability
of appellate review of a death sentence, a procedure of
which virtually all jurors are surely aware. Because I
cannot agree with the majority's analysis of either of these
issues, I must respectfully dissent.

I.

A.

I turn first to the argument that the prosecution violated
Batson by using peremptory challenges to strike three
African Americans from the jury panel. In Batson , the
Supreme Court held that it is a violation of the Equal
Protection Clause for a prosecutor to strike a juror because
of race. The Court also set out a three-step process for
adjudicating a claim that a particular peremptory was
racially based.

> [O]nce the opponent of a peremptory challenge has
> made out a prima facie case of racial discrimination
> (step one), the burden of production shifts to the
> proponent of the strike to come forward with a race-
> neutral explanation (step two). If a race-neutral
> explanation is tendered, the trial court must then
> decide (step three) whether the opponent of the strike

has proved purposeful racial discrimination. Hernandez v. New York, 500 U.S. 352, 358–359 (1991)(plurality opinion); id., at 375 (O'CONNOR, J., concurring in judgment); Batson, [476 U.S.] at 96–98.

Purkett v. Elem, 514 U.S. 765, 767 (1995)(per curiam).

In this case, the Superior Court found that the petitioner, William Riley, made out a prima facie case, see Riley v. State, No. 200, 1988 (Super. Ct. April 21, 1989) at 2, and the state does not dispute this point. The state offered race-neutral justifications for its contested strikes, and the state courts accepted those explanations and found that the disputed peremptories were not racially based. Id. at 3-6; Riley v. State, 585 A.2d 719, 725 (Del. Sup. Ct. 1990). The majority however, rejects the state courts' findings regarding two of the state's peremptories and substitutes its own contrary findings. I will discuss each of the challenges on which the majority relies.[1]

B: Ray Nichols

1. The prosecutor testified that he struck Nichols because he was uncertain that Nichols would be able to vote for a death sentence. See App. 797-99. According to the prosecutor's testimony, "there was a pause and a significant pause in [his] answering [the trial judge's] inquiry and that to me was enough to suggest that he might not be able to return a death penalty." Id. Having heard the prosecutor's testimony, the judge who presided over the Batson hearing [hereinafter"the hearing judge"], concluded: "I find the State provided a credible, race-neutral reason for exercising its peremptory challenge after appraising the demeanor and credibility of the juror. The State's exercise of its peremptory challenge was non-discriminatory. I am satisfied that the peremptory challenge was not made on the ground of the juror's race." Id. at 889.

_____

1. Riley also contends that a third member of the venire, Lois Beecher, was peremptorily challenged by the state because of race. The majority, however, does not rely on this strike, and accordingly I do not discuss it in this opinion.

Riley suggests that it is not believable that the prosecutor was able to remember at the time of the evidentiary hearing in 1988 that Nichols had paused while answering a question during voir dire six years earlier. In addition, Riley contrasts the prosecutor's ability to remember this pause with his inability to remember another potentially significant aspect of the jury selection process, and Riley notes that the prosecutor was a friend and neighbor of the victim. These facts were highlighted during the cross-examination of the prosecutor at the Batson hearing, see App. 820-29, and I agree that they were important factors to be considered in assessing the prosecutor's credibility. The hearing judge was aware of these facts and had the opportunity to observe the prosecutor testify on the witness stand. Despite these facts, however, the hearing judge found that the prosecutor's testimony was credible.

Our standard of review of the hearing judge's finding is narrow. In Batson, the Supreme Court took pains to note that "[s]ince the trial judge's findings in the context under consideration here will largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Batson, 476 U.S. at 98 n.21. In a later case applying Batson, the plurality elaborated:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercised the challenge. . . . [E]valuation of the prosecutor's state of mind based on demeanor and credibility lies `peculiarly within a trial judge's province.'

Hernandez v. New York, 500 U.S. 352, 353 (1991) (pluralty) (citation omitted).

Because the present case is a proceeding under the federal habeas statute, our scope of review is, if anything, even narrower. Under 28 U.S.C. S2254(d)(8)(1988 & Supp. 1990), any state-court factual finding that is "fairly supported by the record" is entitled to a presumption of correctness. Discussing this provision, the Supreme Court

84

wrote in Marshall v. Lonberger, 459 U.S. 422, 434 (1983), that "28 U.S.C. S 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Accord, Rushen v. Spain, 464 U.S. 114, 122 n.6 (1983)(per curiam). The Marshall Court elaborated:

> In United States v. Oregon Medical Society, 343 U.S. 326 (1952), commenting on the deference which this Court gave to the findings of a District Court on direct appeal from a judgment in a bench trial, we stated:
>
> "As was aptly stated by the New York Court of Appeals, although in a case of a rather different substantive nature: `Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth. . . . How can we say the judge is wrong? We never saw the witnesses. . . . To the sophistication and sagacity of the trial judge the law confides the duty of appraisal.' Boyd v. Boyd, 252 N.Y. 422, 429,169 N.E. 632." Id., at 339.
>
> We greatly doubt that Congress, when it used the language "fairly supported by the record" considered "as a whole" intended to authorize broader federal review of state court credibility determinations than are authorized in appeals within the federal system itself.

459 U.S. at 434. See also Purkett, 514 U.S. at 769.

Under the very limited scope of review that applies here, I do not see how the hearing judge's finding that the prosecutor testified truthfully regarding the reason for challenging Nichols can be overturned. The hearing judge heard the prosecutor testify. He was aware of the factors noted above that provided grounds for doubting his testimony, but he nevertheless found that the prosecutor was truthful. I would sustain that finding.

2. The majority rejects that finding (as well as the state courts' finding with respect to another prospective juror

85

whom I discuss below) in large part because, in the majority's view, "there is no basis to determine if the state courts undertook, or even were aware of, the required Batson step three inquiry." Maj. Op. at 36. In making this argument, the majority (a) misunderstands what Batson requires, (b) ignores what the Delaware courts did in this case, (c) imposes novel and unwarranted procedural requirements on the state courts, and (d) awards relief that extends beyond what its own logic warrants.

What step three of Batson requires. Although the majority makes step three seem elaborate and elusive -- so elusive that, according to the majority, the Delaware courts may not have "fully appreciated the requirement" (Maj. Op. at 32) -- step three, is neither conceptually difficult nor procedurally complicated. Step three simply requires the judge to make a finding of fact -- "to determine if the defendant has established purposeful discrimination," Batson, 476 U.S. at 98 (footnote omitted). See also Purkett, 514 U.S. at 767; Hernandez, 500 U.S. at 358-59 (plurality opinion); id. at 375 (O'Connor, J., concurring in judgment). Neither Batson nor any subsequent Supreme Court or Third Circuit case has added to this requirement.

What the Delaware courts did. The Delaware courts did exactly what step three requires. With respect to potential juror Nichols, the hearing judge, whose analysis the state supreme court endorsed, see 585 A.2d at 725, noted that the state had provided a race-neutral reason for the challenge, stated that he found the explanation credible, and concluded: "I am satisfied that the peremptory challenge was not made on the ground of the juror's race."[2] This is precisely the finding that step three of Batson mandates. See Batson, 476 U.S. at 98 (the court has "the duty to determine if the defendant has established purposeful discrimination").

What the majority requires. Although the majority opinion is loathe to admit it, what the majority really finds wanting in the opinions of the Delaware courts is not a failure to make the finding mandated by step three of the Batson

_____

2. The state courts' findings regarding the other potential juror at issue,
Charles McGuire, are discussed below. See infra at 91-93.

inquiry but a failure to comment on the record regarding evidence that seems, in the majority's view, to undermine the prosecution's proffered explanations for the disputed peremptories. See Maj. Op. at 29 ("the state courts in this case rejected Riley's Batson claim without discussing any of the ample evidence that throws into question the explanations offered by the prosecutor for striking two of the black jurors . . . .").3 This approach is inconsistent with the federal habeas statute and Supreme Court precedent.

The provision of the federal habeas statute on which the majority relies provides that if a state court's "determination after a hearing on the merits of a factual issue" is "evidenced by a written finding, written opinion, or other reliable and adequate written indicia," that determination "shall be presumed to be correct" unless it is not "fairly supported by the record" as a whole. 28 U.S.C. S2254(d)(8)(1988 & Supp. 1990)(amended 1996). Under this provision, the state court's factual determination must simply be evidenced by "a written finding, written opinion, or other reliable and adequate written indicia," and it is not even necessary that a state court "specifically articulate its credibility findings." LaVallee v. Delle Rose , 410 U.S. 690, 692 (1973). See also Marshall v. Lonberger, 459 U.S. at 433. Thus, 28 U.S.C. S 2254(d) plainly does not authorize us to disregard a state court's factual finding on the ground that the state court failed to discuss all the evidence or to explain why it was not persuaded by a particular piece of proof.

I do not question that a judge, in making the factual finding required by step three of Batson, should consider all

_____

3. See, e.g., Maj Op. at 18 ("With regard to both Nichols and McGuire, the state courts failed to mention in their opinions the weaknesses in the State's explanations . . . ."); id. at 20 ("[T]he hearing judge discussed neither the statistics nor the State's failure to explain them[,] . . . overlooking and ignoring a significant segment of Riley's evidence . . . .");
id. at 21 (hearing judge made no "reference to, or analysis of, Riley's evidence of pretext"); id. at 28 ("Here, the state courts failed to examine
all of the evidence to determine whether the State's proffered race-neutral explanations were pretextual. Not only is there no indication on the record that the hearing judge engaged in the required analysis, but there is no indication that the Delaware Supreme Court did so.").

of the relevant evidence that has been adduced. But neither
Batson nor any later Supreme Court or Third Circuit case4
suggests that a federal habeas court is free to reject the
factual findings of a state court if the state court does not
comment on all of the evidence or provide what the federal
court regards as a satisfactory explanation for its finding.5

_____

4. The only Third Circuit case cited in this connection by the majority
(see Maj. Op. at 35) is Jones v. Ryan, 987 F.2d 960 (1993). Jones,
however, was very different from the present case (see footnote nine,
infra) and does not support the proposition that a finding of a state
court
is not entitled to the presumption of correctness if the state court did
not
explain why the court was not persuaded by particular items of evidence.

5. Nor does the majority cite much other authority to support its
position. See Maj. Op. at 28, 30, 34, 35. The majority (at 28) quotes
dictum in a footnote in United States v. McMillon, 14 F.3d 948, 953 n.4
(4th Cir. 1994)(emphasis added), to the effect that at step three of
Batson
"the court then addresses and evaluates all evidence introduced by each
side." The reasons for not attaching too much weight to one word
("addresses") in this statement are too obvious to require mention.

The majority cites two federal habeas cases in which courts of appeals
found great fault with the procedures used by state judges in
adjudicating Batson objections. In Jordan v. LeFevre, 206 F.3d 196 (2d
Cir. 2000), the court of appeals held that the trial judge "could not
properly decide the third Batson step" because he "resisted counsel's
efforts to make arguments regarding the peremptory strikes so as to
create a full record" and instead "ruled summarily" after "an extremely
brief colloquy." Id. at 201. Likewise, in Coulter v. Gilmore, 155 F.3d 912
(7th Cir. 1998), the court of appeals spent several pages describing the
bizarre nature of the procedure used by the state trial court in ruling on
Batson objections. Id. at 915-16, 918. The court of appeals ultimately
concluded that the state court had not considered the totality of the
relevant circumstances and thus ordered that the petitioner be released
if the state court did not conduct a Batson hearing using "the proper
methodology." Id. at 922. The procedures used by the Delaware courts
in the present case bear no resemblance to the procedures found
deficient in Jordan and Coulter.

The majority also cites two appeals in which the Sixth Circuit
remanded cases for the district courts to provide more complete
explanations of Batson rulings. See United States v. Harris, 192 F.3d
580, 588 (6th Cir. 1999); United States v. Hill , 146 F.3d 337 (6th Cir.
1998). These, however, were direct federal appeals, not habeas
proceedings initiated by state prisoners, and the relief ordered --
remands for fuller explanation -- goes far beyond what the majority
ordered here.

The majority confuses the obligation to consider all of the relevant evidence (something that a court should always do in making findings of fact) with the obligation to comment on all of the evidence (an obligation that we are not free to impose on state courts).

In this case, as I have noted, there is no question that the state courts did precisely what step three of Batson required -- they made findings as to whether Riley had established purposeful discrimination. And they did so only after discovery and a thorough hearing. There is no reason to believe that the state courts did not consider all of the relevant evidence, including all of the evidence that the majority now finds persuasive. The Delaware courts simply did not comment on all of this evidence. (Judgments about credibility based on a witness's demeanor often do not lend themselves to such explanation). But the Delaware courts were not obligated to comment on all of the evidence. The majority in this case reviews the decisions of the Delaware courts as if they were decisions of a Social Security administrative law judge, who must, we have held,"give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). The Delaware courts, however, are not to be treated as if they were federal administrative agencies.

The majority's relief. Even if the majority were correct that the Delaware courts were obligated to explain on the record why they accepted the prosecution's explanations for its strikes and were not persuaded by Riley's evidence, that would hardly justify the relief that the majority orders -- the granting of the writ unless Riley is re-tried. When a decision is found to be faulty for failure to provide an adequate explanation, the logical remedy is to remand so that an adequate explanation can be supplied. See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Motor Vehicle Mfrs. Assn. v. State Farm Mut., 463 U.S. 29, 57 (1983). Here, however, the majority does not give the Delaware courts a chance to comply with the majority's newly found procedural requirements. Nor does the majority remand to the District Court for a hearing and findings specifically addressing the points that the majority views as important. Instead, the majority orders that the writ be granted unless Riley is re-tried.

89

How the state courts' failure to address Riley's evidence on the record can justify such relief is baffling. If the lack of explanations on the record is important to the majority's analysis, then the case should be remanded so that explanations may be provided. If no explanations on the record could satisfy the majority -- and I believe that to be the case -- then the majority's lengthy discussion of the inadequacy of the Delaware courts' opinions is beside the point.

3. The majority's remaining reasons for rejecting the hearing judge's finding require little response. The majority notes that, although the prosecutor testified that Nichols paused, "the record reflects no such pause." Maj. Op. at 16. I have read many trial transcripts, and I do not recall any in which the court reporter noted that a witness had or had not paused before answering a question.

The majority finds it significant that "despite Nichols' alleged pause, the prosecutors did not ask the trial court to remove Nichols for cause." Maj. Op. at 17. The majority raises the question "why if Nichols actually did pause `a significant pause,' the state did not seek to have him removed for cause." Id. Does the majority seriously believe that a prospective juror who pauses before answering a question about the death penalty may properly be removed for cause?

The majority observes that "[t]he record does not show . . . that any of the contemporaneous notes kept by the prosecutors as to some of the jurors reflected either the existence of a pause or the concern about which[the prosecutor] testified six years later." Maj. Op. at 17. The prosecutor's notes, however, consist of a handwritten sheet with a few words or abbreviations scrawled next to the names of some of the prospective jurors. Nichols's name is not even on this sheet. The notes by no means record the reasons for all of the prosecution's strikes.

I wish there were some scientific test that could determine with complete certainty whether Nichols paused and whether the prosecutor told the truth. Unfortunately, there is no such test. We must rely to a substantial degree on the ability of the judge who heard the prosecutor's

90

testimony to make an accurate assessment of his credibility. There is no question that the hearing judge took his responsibility seriously and made his finding in good faith. Our role under the federal habeas statute is to determine whether that credibility finding is "fairly supported by the record." It is.

C: Charles McGuire.

1. Riley's strongest Batson claim concerns the prosecution's strike of Charles McGuire. At trial, the prosecutor first used a peremptory challenge against McGuire and then immediately made the following application to the trial judge:

> [THE PROSECUTOR]: Your Honor, may I ask the Court to reconsider charging the State for that strike. This Mr. McGuire came to chambers yesterday and expressed his belief that he didn't know if he could last the two weeks [the estimated length of the trial], there was some problem with work. He was an inspector or something for the Department of Labor. I know he came in yesterday.
>
> THE COURT: I will not strike him for cause for that reason. He asked to be excused yesterday and I decided not to excuse him.

App. 250.

At the evidentiary hearing held before the hearing judge, the prosecutor testified that he struck McGuire because McGuire "had previously requested to be excused from jury service" and because the prosecutor "wanted attentive jurors" who were not worried about missing other obligations or activities while the trial took place. App. 801.

The defense called McGuire as a witness at the evidentiary hearing. McGuire testified that he was employed by the State of Delaware as a Social Security "disability adjudicator," App. 846-47; that he had been reporting for jury duty in the courthouse in Dover for two to three weeks before he was questioned in connection with the Riley case but had not been seated on a jury, id. at 852-53; that while he was away from work, the disability claims assigned to

him would "just sit[ ]," id. at 850; that the director of his office had told him that he was going to make a"formal request" that McGuire be excused, id. at 860; that such a request was sent, id. at 853, 856; and that the request had been discussed in chambers with the judge. Id . at 849-50, 856. McGuire said, however, that he himself had never expressed an unwillingness to serve on the jury and had been willing to do so. See id. at 850.

The hearing judge accepted the prosecutor's explanation of the reason for striking McGuire. The hearing judge found:

> The State peremptorily challenged Charles McGuire because [the prosecutor] believed he requested to be excused from jury duty and, therefore, may have been unable or unwilling to serve for the entirety of the trial. . . . McGuire's employer sent a letter requesting he be released from jury duty because he could not be replaced at his job if he was chosen for jury duty. The letter by McGuire's employer clearly gave the State reason to question whether McGuire would give his full time and attention to the trial and whether he would be able to serve for the entirety of the time projected for the trial. Whether McGuire, in fact, did not request relief from jury duty and did wish to serve is of no consequence.

Riley v. State, No. 200, 1988 at 4-5 (emphasis added). The hearing judge then noted that the state's explanation for striking McGuire, was "entirely unrelated to the juror's race," and the judge credited that explanation. Id. at 5. Obviously, by crediting an explanation that was"entirely unrelated to the juror's race," the hearing judge necessarily found that Riley had not "established purposeful discrimination," Batson, 476 U.S. at 98, and the hearing judge thus fully complied with Batson's step three.6

Several factors provide substantial support for this finding. It is apparent that McGuire's work situation was on

_____

6. The majority, however, incorrectly suggests (Maj. Op. at 33) that finding "the prosecutor to be credible" is different from finding that purposeful discrimination was not proved.

the prosecutor's mind when McGuire was peremptorily challenged because, as noted, immediately after striking McGuire, the prosecutor asked that McGuire's dismissal be deemed for cause since he had "expressed his belief that he didn't know if he could last the two weeks." App. 250. In addition, a reasonable prosecutor might well have wondered whether McGuire's work situation would adversely affect his attentiveness at trial. As noted, McGuire's supervisor had made a "formal request" that he be excused"because he could not be replaced at his job if he was chosen for jury duty."7 Whether or not McGuire himself in fact wished to serve on the jury, the impression apparently was conveyed that McGuire wanted to be excused and to return to work, since the trial judge commented: "He asked to be excused yesterday and I decided not to excuse him." See App. 250. Under these circumstances, a reasonable prosecutor could have been concerned that McGuire might have been inattentive at trial due to worry about missing work, leaving his duties unattended, and perhaps incurring his supervisor's displeasure.

Riley attacks the hearing judge's finding on two grounds. First, he points out that, according to McGuire's testimony at the post-conviction relief evidentiary hearing, McGuire himself did not ask to be excused. This argument is unpersuasive. Although McGuire testified that he did not ask to be excused, the trial judge, as noted, stated at the time of McGuire's dismissal: "He asked to be excused yesterday and I decided not to excuse him." App. 250 (emphasis added). Thus, McGuire, who was unable to remember many details at the time of the post-conviction relief evidentiary hearing, see id. at 853, 857–62, may have been mistaken, or he may have conveyed the impression at the time of trial that he personally wanted to be excused.

Second, Riley points out that the handwritten sheet prepared by the prosecutors during voir dire contains the following notation next to the name of a white juror, Charles Reed, whom the prosecution did not peremptorily strike: "works Lowe's -- wants off." One of the prosecutors

_____

7. Riley v. State, No. 200, 1988 at 4. See also App. 860 (McGuire's testimony at the evidentiary hearing).

93

was questioned about this notation by Riley's attorney at the post-conviction relief evidentiary hearing, but the prosecutor testified that he had no recollection of Reed. See App. 823-24.

The notation by Reed's name and the prosecutor's testimony at the evidentiary hearing are certainly factors that the hearing judge could have viewed as tending to undermine the credibility of the prosecutor's explanation for striking McGuire, but the notation and the prosecutor's testimony are insufficient to show that the hearing judge's finding is not "fairly supported by the record." 28 U.S.C. S 2254(d). It is reasonable to infer from the notation "wants off " that, at some point in the jury selection process, Reed expressed a desire to be excused for some reason. As far as I am aware, however, the record does not establish why8 or how strongly Reed wanted to be excused. The transcript of the voir dire shows that, at the final stage of the jury selection process, the members of the venire were asked whether there was "any reason why [they] absolutely [could not] serve," App. 223; that members of the venire then successfully asked to be released for reasons such as a previously planned vacation, id. at 253; but that Reed made no request to be excused at that time. See id . at 229-30. Thus, as far as the record appears to reveal, Reed may have had a relatively weak desire and reason to be excused, and his situation may not have been at all comparable in this respect to McGuire's.9

_____

8. Although the notation "wants off " appears after the words "works at Lowe's," it is not clear that Reed's desire to be excused was related to his
employment. The prosecutor's notes appear to contain notations of the employment of other jurors.

9. Many decisions have held that Batson is not contravened simply because two jurors exhibit similar characteristics and one is excluded while the other is retained. See, e.g., Matthews v. Evatt, 105 F.3d 907, 918 (4th Cir. 1997); United States v. Spriggs , 102 F.3d 1245, 1255 (D.C. Cir. 1997); United States v. Stewart, 65 F.3d 918, 926 (11th Cir. 1995); United States v. Alvarado, 951 F.2d 22, 25 (2d Cir. 1991); United States v. Lance, 853 F.2d 1177, 1181 (5th Cir. 1988); United States v. McCoy, 848 F.2d 743, 745 (6th Cir. 1988); United States v. Lewis, 837 F.2d 415, 417 n.5 (9th Cir. 1988).

As I have noted, our scope of review of the hearing judge's finding is narrow. Although it would be satisfying to know why Reed was not stricken, that unanswered question is not enough, in view of the "great deference"[10] owed the hearing judge's credibility determination, to demonstrate that the hearing judge's finding is not "fairly supported by the record."[11] 28 U.S.C. S 2254(d)(8) (1988 & Supp. 1990).

In an effort to bolster its unusual decision to overturn the hearing judge's credibility finding, the majority points to a statement contained in the brief filed by the state in Riley's direct appeal. The majority writes:

> When Riley's direct appeal came before the Delaware Supreme Court in 1984, the State justified the use of race in selecting jurors in criminal trials. On that occasion, which was the State's first opportunity to defend the use of its peremptory challenges in Riley's trial, the State did not offer a single race-neutral explanation, not even as an alternate argument; instead, it claimed that it was permissible -- even socially desirable -- to exclude jurors based on what it called `group association.' "

Maj. Op. at 25 (quoting App. 896).

This argument is not well taken. Responding to Riley's suggestion that the Delaware Supreme Court should hold that individual race-based peremptories were unconstitutional, the state's brief argued as follows:

> Because the Sixth Amendment does not support [Riley's argument] and the decision in Swain v. Alabama, 380 U.S. 202 (1965), more appropriately recognizes how peremptory challenges, even those

_____

10. Batson, 476 U.S. at 98 n.21.

11. This case is very different from Jones v. Ryan, 987 F.2d 960 (1993). There, exercising plenary review in the absence of any findings of fact by a state court, we held that Batson was violated where the prosecutor excluded a black juror who had a child approximately the same age as the defendant, while retaining a white juror who was similarly situated. Jones, 987 F.2d at 973. In the present case, we are limited to deciding whether the state court finding is fairly supported by the evidence.

> exercised on the basis of group association, foster the
> constitutional goal of an impartial jury, the state
> asserts that no reversal is required here.

App. 896-97 (footnotes omitted). Thus, the state's brief --
which the lead trial prosecutor did not even sign-- merely
urged the state supreme court to follow the reasoning of the
United States Supreme Court in what was then the
governing federal precedent. It is far-fetched to interpret the
state's reliance on Swain as a tacit admission that its
peremptories in this case were based on race -- particularly
since, in a footnote to the sentence quoted above, the state
was careful to deny that its challenges were racially based.12

It is also unreasonable to draw an adverse inference
against the state for not providing race-neutral
explanations for its challenges in its appellate brief. Since
there was no evidence in the record regarding the reasons
for the strikes, the state could hardly have expected the
state supreme court to base a decision on explanations
provided without record support. The majority's arguments
regarding the state's brief are insubstantial.

The majority's reliance on statistical evidence is even
worse. In the Batson proceeding before the hearing judge,
Riley made a proffer that no African American had served
on any of the three other first-degree murder trials that had
occurred in Kent County within a year of his own and that
in those cases the prosecution had peremptorily challenged
five African Americans. The three other trials were those of
Andre Deputy, an African American, and two whites, Daniel
Pregent, who was acquitted, and Judith McBride, who was

_____

12. The state's brief stated that it "emphatically denie[d] that the
prosecutor exercised any of his challenges solely on the assumption that
the juror's race, in the context of the facts of this case, indicated a
verdict position adverse to the prosecution." App. 896. The majority
seizes on the word "solely" in this sentence as a tacit admission that
race
played a part in the decision to exercise peremptories. In my view, it is
wholly unreasonable to read that much into the word"solely." The
Supreme Court in Batson itself used this same word in the same
context. See 476 U.S. at 89 (emphasis added)("[T]he Equal Protection
Clause forbids the prosecutor to challenge potential jurors solely on
account of their race.").

96

convicted. With respect to these cases, no information was provided at the time -- and none has been provided since -- about the identities of the prosecutors who participated in jury selection, the racial makeup of the venire, or the race of jurors who were dismissed for cause or peremptorily challenged by the defense.

In the trial of Andre Deputy, who was convicted and ultimately executed, the state struck four whites, one African American, and one person listed as "Indian." Deputy argued that the prosecution's peremptory challenge of the African American venireperson violated Batson. See Deputy v. Taylor, 19 F.3d 1485, 1492 (3d Cir. 1994). Deputy's Batson argument was rejected in the district court decision denying his petition for a writ of habeas corpus, and our court affirmed. See id. at 1492. Since it has been held that no Batson violation was shown in Deputy, it is difficult to see how that case can be viewed as supporting Riley's argument here.

In Pregent's case, the state struck four whites and one black. There is nothing before us to indicate that any Batson objection was made, and it is doubtful that the pattern of strikes exercised by the prosecution sufficed to make out a prima facie case.

The remaining case is the prosecution of Judith McBride for murdering her husband. See McBride v. State , 477 A.2d 174 (Del. 1984). The state exercised a total of 10 strikes, of which three were against potential jurors identified as black.13 There is nothing to indicate that any Batson objection was made. Without in effect holding a Batson hearing, there is no way of determining whether any prosecution peremptories were based on race.

Although Riley was represented at the Batson hearing by a professor of law and has been represented in the federal habeas proceeding by attorneys from one of the nation's leading law firms, no expert analysis of these statistics has ever been offered.14 According to the majority, however, the "sophisticated analysis of a statistician" is not needed to

_____

13. According to Riley's statistics, five of those struck by the state were
white, and the race of two is not provided.
14. The majority's statement that "the procedural posture of the case" provided "no opportunity" for Riley to offer an expert analysis of his statistics (Maj. Op. at 38) is difficult to understand. What stopped Riley from offering the evidence of a statistician as to the significance of the scant statistics that Riley provided?

interpret the significance of these statistics. Maj. Op. at 19. "An amateur with a pocket calculator," the majority writes, can calculate that "there is little chance of randomly selecting four consecutive all white juries." Id.

Statistics can be very revealing -- and also terribly misleading in the hands of "an amateur with a pocket calculator." The majority's simplistic analysis treats the prospective jurors who were peremptorily challenged as if they had no relevant characteristics other than race, as if they were in effect black and white marbles in a jar from which the lawyers drew. In reality, however, these individuals had many other characteristics, and without taking those variables into account, it is simply not possible to determine whether the prosecution's strikes were based on race or something else.

The dangers in the majority's approach can be easily illustrated. Suppose we asked our "amateur with a pocket calculator" whether the American people take right- or left-handedness into account in choosing their Presidents. Although only about 10% of the population is left-handed, left-handers have won five of the last six presidential elections.15 Our "amateur with a calculator" would conclude that "there is little chance of randomly selecting" left-handers in five out of six presidential elections. But does it follow that the voters cast their ballots based on whether a candidate was right- or left-handed?

Whether even a careful multiple-regression analysis of peremptory challenge statistics in other cases would suffice to show that a Batson violation occurred in this case is unclear. Cf. McClesky v. Kemp, 481 U.S. 279 (1987). Here, however, we have not been presented with any expert statistical evidence.

The majority and the concurrence argue that an adverse inference should be drawn against the state for failing to come forward with data to rebut Riley's statistics. I see no basis for this approach. Whether an adverse inference should be drawn under particular circumstances based on

_____

15. See "Forget Left-Wing. Say Hello to Left-Handed Politics," New York Times, Jan. 23, 2000.

a party's failure to produce evidence in a state proceeding is in the first instance a question of state law, and unless a state court's failure to draw such an inference in a particular case denies due process or a fair and adequate hearing, a federal habeas court should be reluctant to reject the state court's ruling. Cf. 28 U.S.C. S 2254 (6) and (7) (1988 & Supp. 1990) (amended 1996). Moreover, even if this were a collateral attack on a federal conviction, we would defer to the decision of the judge who conducted the hearing as to whether the circumstances justified the drawing of adverse inference and would reverse only if the judge committed an abuse of discretion. See, e.g., Bouzo v. Citibank, N.A., 96 F.3d 51, 60 (2d Cir. 2000).

Here, the state courts' failure to draw such an inference certainly did not constitute an abuse of discretion. The state was never given notice that it had any obligation to provide additional data, and it is not at all clear what sort of evidence the majority expects the state to have provided. The information that is most critically lacking-- the prosecutors' reasons for striking the five African American venire members in the Deputy, McBride, and Pregent cases -- probably could not have been obtained without in effect conducting retrospective Batson hearings in those cases. Does the majority think that such a hearing would have been practical? Or does the majority think that the state should have retained am expert to analyze the state's use of peremptory challenges in some other set of cases? In order to make such an analysis, the expert probably would have needed detailed information about the prospective jurors whom the state did and did not strike -- e.g., their ages, marital status, education, occupations, and past experiences with law enforcement, to name just a few of the myriad variables that often figure in decisions about peremptory challenges. We have no indication that such information was available, and in any event, compiling and analyzing the data concerning a reasonable sample of cases could have been a massive undertaking. In my view, it is entirely unwarranted to hold that the state courts abused their discretion because they did not draw adverse inferences from the state's failure to volunteer to conduct such a study in response to the statistics that Riley proffered.

99

In sum, I see no ground for overturning the hearing judge's credibility findings. I would thus hold that the presumption of correctness has not been overcome and would reject Riley's Batson argument. The majority -- by in effect making its own credibility findings on the cold state court record -- seriously errs. See Marshall v. Lonberger, 459 U.S. at 434.

II.

I now turn to the majority's holding that a remark made by the prosecutor in closing argument at the penalty phase of the trial violated Caldwell v. Mississippi , supra. In Caldwell, the defense attorney's closing argument asked the jury to "confront both the gravity and responsibility of calling for another's death." 472 U.S. at 324. In response, the prosecutor took strong exception to the defense attorney's comments and stated:

> Now, they would have you believe that you're going to kill this man and they know -- they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it. . . . For they know, as I know, and as [the judge] has told you, that the decision you render is automatically reviewable by the Supreme Court.

Id. at 325-26.

By a vote of five to three, the United States Supreme Court reversed the defendant's death sentence. The plurality opinion approved by four justices concluded that the prosecutor's comments were improper for two reasons: first, because the prosecutor's description of the state scheme of appellate review was not "accurate" and, second, because the availability of appellate review was "wholly irrelevant to the determination of the appropriate sentence." Id.

Justice O'Connor, who cast the deciding fifth vote for reversal, refused to endorse the principle that "the giving of nonmisleading and accurate information regarding the jury's role in the sentencing scheme is irrelevant to the sentencing decision." 472 U.S. at 341 (opinion of O'Connor,

100

J.) (emphasis added). However, she agreed that the prosecutor's statements were improper because they "creat[ed] the mistaken impression that automatic appellate review of the jury's sentence would provide the authoritative determination of whether death was appropriate," whereas in fact the state supreme court exercised only a narrow scope of review. Id.

In subsequent cases, the Court has clarified the holding in Caldwell. In Romano v. Oklahoma, 512 U.S. 1, 9 (1994), the Court wrote as follows:

> As Justice O'CONNOR supplied the fifth vote in Caldwell, and concurred on grounds narrower than those put forth by the plurality, her position is controlling. See Marks v. United States, 430 U.S. 188, 193 (1977) . . . . Accordingly, we have since read Caldwell as "relevant only to certain types of comment --those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." Durden v. Wainwright, 477 U.S. 168, 184, n.15 (1986). Thus, "[t]o establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." Dugger v. Adams, 489 U.S. 401, 407 (1989), see also Sawyer v. Smith, 497 U.S. 227, 233 (1990).

The Romano Court rejected the Caldwell argument advanced in that case because "the jury was not affirmatively misled regarding its role in the sentencing process." Id. at 10.

Riley's argument is based on a statement made by the prosecutor near the very beginning of his summation at the sentencing phase of the trial. The prosecutor stated:

> As the Judge has explained to you we have a specific statute with regard to what occurred in a penalty hearing on a capital case.

> Let me say at the outset that what you do today is automatically reviewed by our Supreme Court and that is why there is an automatic review on the death

101

penalty. That is why, if you return a decision of death, that is why you will receive and have to fill out a two-page interrogatory that the Court will give you. This is an interrogatory that specifically sets out the questions that the State request and whether or not you believe it beyond a reasonable doubt and if you want in your determination, if you believe the sentence should be death then each and every one of you has to sign this. This goes to the Supreme Court. That is why it is concise and we believe clear and it should be looked carefully on and answered appropriately.

App. 393 (emphasis added). Riley argues that the highlighted words quoted above violated Caldwell .

In its decision on direct appeal, the Delaware Supreme Court responded to this argument as follows:

[T]he prosecutor's remarks in no way suggested that responsibility for ultimately determining whether defendant faced life imprisonment or death rested elsewhere. The prosecutor's passing comment to the jury that its decision would be "automatically reviewed" was fairly made in the context of the prosecutor's preceding reference to the "specific statute[controlling] a penalty hearing on a capital case." 11 Del.C.S 4209. Since subsection (g) of S 4209 mandates the"Automatic Review of Death Penalty by Delaware Supreme Court", the prosecutor in the instant case was simply quoting the statute. In no sense may it reasonably be said that the prosecutor was either misstating the law, misleading the jury as to its role, or minimizing its sentencing responsibility.

496 A.2d at 1025 (alteration in original). I agree with this analysis.

The prosecutor's remarks in Caldwell were"quite focused, unambiguous, and strong." 472 U.S. at 340. The clear message was that, contrary to the suggestion of defense counsel that the jury should "confront both the gravity and responsibility of calling for another's death," id. at 324, the jury need not shoulder that responsibility because "the authoritative determination of whether death was appropriate" would be made by the state supreme

102

court. Id. at 343 (Opinion of O'Connor, J.). It was in this sense that the remarks " `improperly described the role assigned to the jury by local law' "16 and thus " `allowed the jury to feel less responsible than it should for the sentencing decision.' "17

The prosecutor's remarks in this case were very different. Here, the prosecutor made accurate, unemotional, passing remarks in the context of describing the state statute and explaining why the jury would have to "fill out a two-page interrogatory" if it returned a capital sentence. These remarks did not convey the message that the jury should not confront the gravity of returning a death verdict, and thus the mere mention of the fact that there would be an automatic appeal to the state supreme court did not mislead the jury as to its role in the sentencing process. In this connection, it is noteworthy that after the closing arguments, the trial judge instructed the jury on its role using language that left no doubt about its responsibility. The trial judge stated: "Where the jury submits such a finding and recommendation, the Court shall sentence the defendant to death." See 585 A.2d at 731 (emphasis added). A "recommendation of death, supported by the evidence, shall be binding on the Court." Id. (emphasis added). "Your unanimous recommendation for the imposition of the death penalty, if supported by the evidence, is binding on the Court." Id. at 734 (emphasis added). In light of the substantial factual differences between Caldwell and this case, and in light of the Supreme Court's subsequent explanation of the meaning of Caldwell, I would reject Riley's Caldwell claim.

The majority appears to hold that a Caldwell violation occurred simply because the prosecutor accurately stated that there would be an automatic appeal to the state supreme court without attempting to explain the scope of review that the state supreme court would exercise. I do not agree with this reading of Caldwell. Neither Justice

_____

16. Romano v. Oklahoma, 512 U.S. at 9 (quoting Dugger v. Adams, 489 U.S. at 407).

17. Romano v. Oklahoma, 512 U.S. at 9 (quoting Durden v. Wainwright, 477 U.S. at 184, n.15).

O'Connor's controlling opinion in Caldwell nor the Court's subsequent explanation in Romano took the position that an unadorned reference to automatic judicial review of a capital verdict is enough to violate the Constitution. And such a holding would make little sense. As the Seventh Circuit has noted:

> Everyone knows that after a death sentence is imposed, there are tiers of appellate review designed to catch errors; the prosecutor wasn't telling the jurors anything they didn't know already. Appellate review is a fact of almost all criminal cases that are tried. Knowledge of this does not cause jurors to take lightly their sentencing responsibilities.

Fleenor v. Anderson, 171 F.3d 1096, 1098 (7th Cir. 1999). What Caldwell forbids is not a simple reference to automatic appellate review, but the suggestion that the scope of review is broader than it is in fact. The remarks in Caldwell conveyed such a suggestion; the comments here did not. I would therefore hold that no Caldwell violation occurred.

III.

Reviewing habeas decisions in capital cases is one of the most important and difficult responsibilities of this court. Our role is vital -- but limited -- and is not to be confused with that of the jury or the various branches of state government. Applying the legal standards that are applicable to us in the present context, I believe that the decision of the district court must be affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit